[Crim. No. 35. Fifth Dist. Apr. 17, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. LYLE CLARK, Defendant and Appellant.

T. N. Petersen for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, Lyle Clark, was charged in the information with the crime of "drunk driving with bodily injury" in violation of section 23101 of the California Vehicle Code, in that on or about the 22d day of April, 1961, in the County of Merced, he did ". . . wilfully and unlawfully, while under the influence of intoxicating liquor drive a motor vehicle upon a public highway and while driving said vehicle did an act forbidden by law, and neglected a duty imposed by law in driving said vehicle, which act and neglect proximately caused bodily injury to Carolyn Geisbrecht."

The first trial of the defendant resulted in a jury disagreement. On the second trial, which lasted five days, the jury brought in a verdict of guilty. The defendant thereafter moved for a new trial, which was denied, and the court granted him probation for the term of three years, the first six months to be served in the county jail.

The appeal is ". . . from the judgment on verdict of conviction entered thereon . . . and from the order denying new trial. . . ." Although there is actually no final judgment of conviction in the case, section 1237, subdivision 1, of the Penal Code provides that an order granting probation is deemed to be a final judgment for the purpose of appeal, and we so consider it.

In order to make clear the circumstances applying to the claim of error, it is necessary briefly to review the evidence in the case.

On April 22, 1961, the defendant was driving a 1953 Studebaker automobile at the rate of about 30 miles per hour on Winton Way near Winton, California. He crossed the Santa Fe railroad tracks, made a left turn onto Santa Fe Avenue and drove parallel to the tracks in a general northwesterly direction on that avenue. A 1951 G.M.C. pickup truck was approaching Clark from the opposite direction. It was driven by Larry Mininger, a teenager, who had three other young people riding in his cab, including Carolyn Geisbrecht. The pickup truck was in its righthand lane, going about 30 miles an hour. Defendant's Studebaker crossed over the white line and hit the left front portion of the truck. The impact occurred about 3 feet from the center line of that road. The tire marks from defendant's car started in his own right lane, swerved into his left lane, and turned back into his right lane. Carolyn Geisbrecht, who was in the pickup, was injured. The defendant himself received a cut on the head and suffered a brain concussion resulting in retrograde amnesia.

After the close of the first trial, defendant claimed that increased memory returned to him and that he could recall a second car approaching him in his own right lane just before the collision. He said that he swerved to his left to miss this third car and came into collision with the Mininger motor vehicle; the defendant did not mention this alleged fact during the first trial. His story was supported at the second trial by a young witness named Sam Barnett, who said he was riding as a passenger in the left back seat of a car traveling on Winton Way which crossed the Santa Fe tracks some distance behind the defendant's car. Barnett testified that when he looked to his left down Santa Fe Avenue he saw the taillights of the Clark car and two sets of headlights approaching the Clark car in an opposite direction along Santa Fe Avenue. He then saw the car with taillights collide with the car whose headlights were in the left or westerly lane. The third car swerved around the taillights and turned off Santa Fe Avenue into Park Avenue, sideswiping a tree at the corner; he said he recognized the latter vehicle as belonging to one Koehn. Sam Barnett was the only witness, besides the defendant, who testified to the presence of a third automobile; however, Mrs. Clark, wife of the defendant, said that the defendant had mentioned something of the sort to her at the hospital shortly after the collision.

The jury evidently did not believe the story about the third car that was vouched for by the defendant, and there are many elements of evidence which run counter to the defendant's contention. For example, Buddy Mancebo, who was driving the automobile in which Barnett rode as a passenger, testified that when his car reached the Santa Fe Railway tracks he could see the flares on the road where the accident had happened and saw no moving cars; in other words, his testimony was to the effect that he reached the scene of the collision a considerable time after it occurred, and if his testimony were believed, obviously Barnett's evidence was untruthful.

The occupants of the pickup truck with which the defendant collided testified that there was no third car at the scene of the accident, and the two Koehns gave evidence that their automobile was not involved and was nowhere near the area when the collision occurred. Furthermore, the witness Barnett had previously stated that he had not witnessed the accident. There was an attempt on the part of defendant to show through the testimony of an expert witness that certain paint

removed from his right rear fender months after the accident was left there by the collision with the Koehn automobile. However, the expert testified that there was no lacquer found in these samples of paint removed from the Clark car, and there was evidence that the primer used on the Koehn car contained lacquer as part of its composition. There was testimony that when appellant's automobile was towed into the junk yard immediately after the collision, there were no paint smears or other indications of damage on the right rear fender. It is not surprising therefore that the jury believed that the marks that were on the fender at the time of the trial were not on it immediately after the accident and that the story about the presence of the Koehn car as a causative factor of the collision was not true.

There was also evidence that sometime after the accident appellant met Mr. Mininger and then said that he felt he was to blame for what had occurred, that he was willing to pay for any damage suffered, including all hospital expenses; also, that he was guilty and that he would admit the reckless driving charge, but he did not feel that he was drunk. At that time he made no claim that a third vehicle was involved in the accident.

However, this court does not purport to pass on the evidence as no claim is made by the appellant that it is insufficient to support the verdict.

In order to prove felony drunk driving, the People had the burden of establishing beyond all reasonable doubt the following elements of the offense: (1) that the defendant drove a vehicle on the public highway; (2) that he was then and there under the influence of intoxicating liquor; (3) that he did some act forbidden by law or neglected a duty imposed by law in the driving of such vehicle; and (4) that such act or neglect proximately caused bodily injury to a person other than himself.

The first, second and fourth elements of the offense were clearly proven, and there is no contention by the appellant to the contrary. The appeal rests solely on the claim that an offered instruction relative to the third element of the offense was not given and that it resulted in a miscarriage of justice insofar as the defendant was concerned.

The appellant offered the following instruction which was refused: "While a person is obligated under the law of this State, to drive a motor vehicle on the right half of a roadway, nevertheless, a motorist is not guilty of any

wrongful act or negligence, as a matter of law, merely because he shifts to the left side of the highway, when it appears that such action is the safest thing to do under the stress of an emergency, or, when the driver is suddenly, and without fault on his part, confronted with such an emergency.''

The Attorney General contends, in opposition to the claim of reversible error on the part of defendant, that the instructions of the court covered this matter and that they were sufficient. ■ It is true that: ''A defendant is entitled to instructions on his theory of the case as disclosed by the evidence no matter how weak such evidence may be and, even though it may not be of a character to inspire belief and however incredible the evidence may be, the defendant is entitled to an instruction based upon the hypothesis that it is entirely true (*People* v. *Carmen*, 36 Cal.2d 768 [228 P.2d 281]; *People* v. *Carnine*, 41 Cal.2d 384 [260 P.2d 16]).'' (Fricke, California Criminal Procedure (5th ed. 1959), Instructions, p. 317.)

In 48 California Jurisprudence 2d, Trial, section 467, page 479, it is said: ''The court should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence.''

The defense attempted to show that the reason for Clark's shifting to his left side of Santa Fe Avenue was to avoid a collision with a third car supposedly being driven toward defendant on its wrong side of the road.

The court gave the following instruction:

''Section 21650 [*] of the California Vehicle Code, reads as follows:

'' 'Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as follows:

'' '(a) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement.

'' '(b) When placing a vehicle in a lawful position for, and when the vehicle is lawfully making, a left turn.

'' '(c) When the right half of a roadway is closed to traffic under construction or repair.

'' '(d) Upon a roadway designated and signposted for one-way traffic.' ''

Appellant claims that this instruction enumerated exceptions which had no foundation in the evidence and that in

---

*Formerly section 525, subdivision (a) of the Vehicle Code.

addition to these four exceptions California law recognizes the further exception (*Jolley* v. *Clemens,* 28 Cal.App.2d 55, 67-68 [82 P.2d 51]) that when a driver is suddenly and without fault on his part confronted with an emergency, he may swerve to the opposite lane of the highway without being guilty of an act forbidden by law if this is, or appears to be, the safest course to follow under the circumstances and is what a reasonably prudent person would do under the circumstances.

Appellant's contention that the failure to give the instruction offered by him constituted prejudicial error is without merit, because another instruction given by the court covered substantially the same ground. The trial judge gave the following instruction:

"A person who, without negligence on his part is suddenly and unexpectedly confronted with peril arising from either the actual presence or the appearance of imminent danger to himself or to others, is not expected nor required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments. His duty is to exercise only the care that an ordinarily prudent person would exercise in the same situation. If at that moment he does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might have been followed by an ordinarily prudent person under the same conditions, he does all the law requires of him, although in the light of after-events, it should appear that a different course would have been better and safer."

In *Jolley* v. *Clemens, supra,* 28 Cal.App.2d 55, 68, it is said, quoting from *Uhl* v. *Fertig,* 56 Cal.App. 718, 724 [206 P. 467]: " ' ' "The rule, judicially stated, is that one who in a sudden emergency acts according to his best judgment, or who, because of want of time in which to form a judgment, omits to act in the most judicious manner, is not chargeable with negligence." (20 Ruling Case Law, p. 29.)' "

The instruction above quoted is the standard imminent peril instruction, CALJIC No. 315, page 270. In *People* v. *Boulware,* 41 Cal.App.2d 268 [106 P.2d 436], the record showed that an intoxicated driver testified that he had observed a truck coming directly toward him and that because of that fact he swerved and hit a car. At the trial, he requested an instruction on imminent peril; such instruction was refused; the court held the appellant's contention of prejudicial error was tenable and reversed the judgment. The defendant was

being tried for unlawfully driving an automobile while under the influence of intoxicating liquor and causing bodily injury*; the court said that if defendant's testimony were believed by the jury, he acted as a reasonably prudent person in swerving his automobile and was entitled to have an instruction read to the jury upon the doctrine of imminent peril.

"The instruction requested by defendant correctly stated the law *apropos* to defendant's theory of the reason for the accident and, since no other instruction on the subject was given, it was prejudicial error for the trial judge to fail to give the requested instruction or an instruction embodying the principles of law stated therein." (*People* v. *Boulware, supra,* 268, 270.)

We hold that the charge to the jury was fair and sufficient and that the refusal of the instruction offered by the defendant did not constitute error in view of the instructions actually given by the court.

The judgment and order denying the motion for a new trial are affirmed.

Brown, J., and Stone, J., concurred.

---

*At that time section 501 of the Vehicle Code.

[Civ. No. 20112. First Dist., Div. Two. Apr. 18, 1962.]

AMERICAN CAN COMPANY et al., Plaintiffs and Appellants, v. CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

Sedgwick, Detert, Moran & Arnold and Scott Conley for Plaintiffs and Appellants.

Dion R. Holm, Thomas M. O'Connor, City Attorneys, and R. J. Reynolds, Deputy City Attorney, for Defendant and Respondent.

SHOEMAKER, J.—On September 17, 1959, Elmo Piombo, while driving a truck owned by the American Can Co., collided with a Municipal Railway tower truck which was parked in the intersection of 16th Street and Potrero Avenue in San Francisco. As a result of this collision, John Murphy and Harry Jones, two employees of the City and County of San Francisco, were thrown from the tower truck and injured. Murphy and Jones thereupon instituted a negligence action against Piombo and the American Can Co. to recover damages for the injuries sustained by them. Piombo and American Can Co. filed a cross-complaint naming the City and County of San Francisco as cross-defendant and asserting that the accident was primarily caused by the negligence of the cross-defendant, or its agents, servants and employees. The cross-defendant then filed a demurrer and a motion to strike the cross-complaint. After the matter had been argued and briefed

by the parties, the trial court granted the motion to strike the cross-complaint.[1]

Piombo and American Can Co. did not appeal from said order, and acquiescing therein, commenced a separate action against the City and County of San Francisco. The complaint set forth the same acts of negligence previously enumerated in the cross-complaint, and prayed for a declaration that defendant City and County of San Francisco was under a duty to indemnify plaintiffs for any judgment or costs which might be assessed against them in the action brought by Murphy and Jones. Defendant moved to strike the complaint on the ground that it attempted indirectly to impose on defendant a greater liability to its employees, Murphy and Jones, than that provided by the California Workmen's Compensation Act; and further, that plaintiffs had failed to allege any contractual right to indemnity as required by law. The trial court granted defendant's motion, and plaintiffs now appeal from the order striking their complaint. ■ (Such an order is appealable as a final determination of the rights of the parties in an action or proceeding. *Honan* v. *Title Insurance etc. Co.* (1935) 9 Cal.App.2d 675, 677 [50 P.2d 1068]; *Witczak* v. *Johnson* (1956) 146 Cal.App.2d 599 [303 P.2d 1091].)

Appellants contend that their complaint set forth a cause of action on two distinct theories: (1) implied indemnity on the ground that respondent's negligence was the primary cause of the accident and the resulting injuries to Murphy and Jones; and (2) liability of respondent pursuant to Government Code, section 53051, for injuries resulting from the dangerous or defective condition of public property.

In order to dispose of appellants' contention that the complaint states a cause of action for "implied indemnity," it becomes necessary to review certain developments in the California law regarding contribution among joint tortfeasors. ■ Prior to 1957, when the Legislature enacted sections

---

[1]The court based its decision on the recent case of *Weissman* v. *Lakewood Water & Power Co.* (1959) 173 Cal.App.2d 652 [343 P.2d 776], where the court held that a cross-complaint for indemnity between codefendants in a personal injury action had properly been dismissed. The court reasoned that the declaratory relief issues would be extraneous to the main case and might confuse the jury (p. 657). It was further suggested that the cross-complainant could bring a separate action against his codefendant and thus resolve the issue of indemnity (p. 658). Disapproved by Supreme Court in *Roylance* v. *Doelger* (1962) 57 Cal.2d 255 [19 Cal.Rptr. 7, 368 P.2d 535].

875-880 of the Code of Civil Procedure, the normal common-law rule, although subject to certain exceptions, was that one joint tortfeasor could not seek contribution or indemnity from another. Pursuant to Code of Civil Procedure, section 875, a limited right to contribution became available "Where a money judgment has been rendered jointly against two or more defendants in a tort action . . . ." Where this section is not applicable, however, the general common law prevails and the party seeking contribution must bring himself within one of the execptions to the rule. In the case at bar, appellants are clearly not seeking contribution pursuant to Code of Civil Procedure, section 875, since no money judgment has been rendered jointly against appellants and respondent. Indeed, appellants themselves expressly negate any such assumption.[2]

The question thus presented is whether the allegations of the complaint are sufficient to bring appellants within one of the recognized exceptions to the common-law rule against contribution. Appellants assert that a right to contribution or indemnity may exist independent of any express contract between the parties and may arise from the fact that one party is guilty of "active" negligence, while the other is merely "passively" negligent. It is appellants' position that such a situation gives rise to an implied obligation on the part of the actively negligent party to indemnify his fellow tortfeasor for all damages which may be assessed against him. In support of this contention, appellants rely upon *City & County of San Francisco* v. *Ho Sing* (1958) 51 Cal.2d 127 [230 P.2d 802], and *Alisal Sanitary Dist.* v. *Kennedy* (1960) 180 Cal.App.2d 69 [4 Cal.Rptr. 379].

Appellants tell us that the *Ho Sing* and *Alisal* cases require the application of the "implied indemnity" doctrine to their complaint. Respondent, on the other hand, urges that these two decisions are readily distinguishable from the in-

---

[2]It would seem evident that section 875 would never be applicable in situations where the injured party is the employee of one of two tortfeasors and the employer has secured workmen's compensation insurance. Since the employee's "exclusive remedy" against his employer is the right to recover compensation (see Lab. Code, § 3601), he may not bring a tort action against the employer, and the two tortfeasors will never be held jointly liable as required by Code of Civil Procedure, section 875. (See *Witt* v. *Jackson* (1961) 57 Cal.2d 57, 70 [17 Cal.Rptr. 369, 366 P.2d 641], where the court indicated that a negligent third party could obtain contribution pursuant to Code Civ. Proc., § 875, only in the *absence* of workmen's compensation.)

stant case because they involved special permit and contractual relationships existing between the two tortfeasors, whereas appellants' complaint, at best, sets forth a speculative tort relationship arising out of an alleged distinction between passive and active negligence. Respondent further argues that even if the *Alisal* and *Ho Sing* cases can be said to lend support to such a theory, an employer such as itself who has obtained workmen's compensation insurance cannot be made indirectly liable to its employees by way of an indemnity action in the absence of an express or implied contract to indemnify the third party tortfeasor. As a final argument, respondent directs this court's attention to Labor Code, section 3864, which provides that if an employee recovers judgment against a third party, the employer, if he has secured compensation insurance, shall have no liability to reimburse or hold such third person harmless on such judgment in the absence of a *written agreement* so to do executed prior to the injury. Respondent concedes that this statute did not become effective until September 18, 1959, the day after the accident occurred, but asserts that it ought to be applied restrospectively because it is merely remedial in effect and disturbs no substantive or vested right of appellants. We do not agree with this argument. Any liability of respondent to appellants arose on September 17, 1959, when the accident occurred. If, on that date, the decisional law of California was such as to allow a right of indemnity between the parties, the retrospective application of a statute altering respondent's liability would clearly have a material effect on the substantive rights of the parties. ▮ In any event, the rule is well established that a statute is presumed to be prospective only in operation and will not be applied retroactively unless such intention clearly appears from the language of the statute itself. (*Krause* v. *Rarity* (1930) 210 Cal. 644, 655 [293 P. 62, 77 A.L.R. 1327].) ▮ Section 3864 contains no language which would justify the conclusion that it was intended to operate retrospectively.

An examination of the California decisions which have allowed indemnity between tortfeasors rather clearly reveals, however, that appellants have failed to state a cause of action. Respondent would appear to be correct in contending that the cases relied upon by appellants do not support the conclusion that the distinction between "active" and "passive" negligence is of itself a sufficient basis for an implied duty to in-

demnify. Both the *Ho Sing* and the *Alisal* cases, as respondent properly points out, involved special relationships between the parties. In the former case, the court based its holding on the special licensor- licensee relationship between the parties, and on the well established rule of other jurisdictions that a municipality has a right of action over against the landowner whose negligent act has caused the city to become liable to a member of the general public. In the *Alisal* case, the plaintiff had hired the defendants to perform certain tasks in a skillful, expert and careful manner. Defendants failed to comply with these contractual obligations and thereby caused plaintiff to incur liability to a third party. Although the *Alisal* case does make some reference to the distinction between primary and secondary negligence, it is apparent to us that appellants' complaint is not framed in such a manner as to meet the requirements there set forth. ▮ The court, in quoting from *Builders Supply Co.* v. *McCabe* (1951) 366 Pa. 322, 325-326, 328 [77 A.2d 368], stated, at page 75: " 'The right of *indemnity* rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by the law to an injured party. It is a right which enures to a person who, without active fault on his part, has been compelled by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable. The difference between primary and secondary liability is not based on a difference in *degrees* of negligence or on any doctrine of *comparative* negligence—a doctrine which, indeed, is not recognized by the common law; . . . It depends on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person. . . .' . . . 'But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.' " An examination of appellants' complaint clearly reveals that the distinction between passive and active negligence upon which they rely consists in reality of comparative negligence or a difference in degrees of negligence. Indemnity based

upon any such theory was specifically disapproved in the above-quoted passage. Appellants' complaint does not allege that respondent owed a different kind of obligation to the injured employees or that respondent's breach of duty was of a different nature than appellants'. The complaint, when viewed most favorably, merely asserts that respondent's tower truck was improperly parked; that respondent's buses were located so as to conceal the truck from view; and that respondent failed to provide a flagman or barricades to direct traffic around the truck. Even if it can be assumed that these omissions on respondent's part were far more negligent than appellant driver's act of proceeding into an intersection despite the fact that his view was impaired by a trolley bus, there is a complete absence of any facts showing that respondent's duty to the injured employees was any greater than appellants', or that there was any special relationship between respondent and appellants which would give rise to a duty of indemnity. On the contrary, the facts alleged in the complaint merely reveal that the concurring negligence of the two parties resulted in certain injuries to Murphy and Jones. Appellants' complaint thus falls squarely within the common-law rule against contribution or indemnity between joint tort-feasors. Under these circumstances, it becomes unnecessary to discuss respondent's contention that the *Alisal* and *Ho Sing* cases are inapplicable to an employer who has complied with the requirements of the California Workmen's Compensation Law. Appellants have failed to allege any facts which would bring them within the exception set forth in those decisions.

Appellants' final contention is that the complaint sets forth a cause of action against respondent under Government Code, section 53051. This argument may be disposed of summarily. Section 53051 provides that "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property" in all cases, where, having notice or knowledge of the condition, those persons having authority to remedy it or to protect the public against it fail, within a reasonable time, to do so. It is apparently appellants' position that the damages recoverable under this section are not limited to direct injury to a claimant's person or property but may be extended to such indirect damages as appellants may ultimately be compelled to pay in defense of the action brought by Murphy and Jones. The

section, as thus interpreted by appellants, is in the nature of an express provision by the Legislature that cities and other local agencies are to be held liable as indemnitors of joint tortfeasors under circumstances where the common law would impose no such duty on the part of an ordinary defendant. This interpretation, while interesting, is of no merit whatever. Prior to the enactment of the Public Liability Act of 1923, from which this section is derived, municipalities and other local agencies were not liable for the negligent acts or omissions of their officers and employees. (*Douglass* v. *City of Los Angeles* (1935) 5 Cal.2d 123, 127 [53 P.2d 353].) The 1923 legislation altered this situation and imposed liability upon the local agencies for the tortious acts of their employees. The purpose of the act was not to impose additional burdens on a governmental agency as compared to any other defendant in a tort action, but was to remove the immunity which had previously absolved the local agencies of any liability whatever. Since, as above noted, appellants' complaint states no cause of action for indemnity under the common law, it is difficult to conceive how Government Code, section 53051, can be of any assistance to appellants. ■ Our courts have consistently held that the statute is to be strictly construed against the claimant. (*Seybert* v. *City of Imperial* (1958) 162 Cal.App.2d 209, 212 [327 P.2d 560]; *Hoel* v. *City of Los Angeles* (1955) 136 Cal.App.2d 295, 303-304 [288 P.2d 989].) In our opinion, the statute was not intended to impose a liability for indemnity where none would exist under the common law.

Order affirmed.

Kaufman, P. J., and Agee, J., concurred.

[Crim. No. 7659. Second Dist., Div. Two. Apr. 18, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS W. FRANKLIN, Defendant and Appellant.

Thomas W. Franklin, in pro. per., for Defendant and Appellant.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—In the initial information appellant was charged with two offenses: (1) kidnapping for the purpose of robbery (Pen. Code, § 209), and (2) robbery (Pen. Code, § 211). On the date set for trial, December 13, 1960, an amended information was filed which contained a third count: receiving stolen property (Pen. Code, § 496). He was found not guilty on counts one and two but guilty on count three. He has appealed from the judgment.

On August 15, 1960, between 2 and 2:30 a.m., one Lawrence Quinn was standing on the corner at the intersection of Normandie Avenue and Beverly Boulevard, in the City of Los Angeles. A car with three male persons in the front seat drove up to the corner. Quinn, thinking he might get a lift on his way home, entered the car and was seated between two of the persons, the third going to the back seat. The car proceeded to Alexandria Place and stopped at an alley. One of the men in the car with Quinn said, "This is it." They got out of the car and Quinn could feel something cold sticking in his neck. It felt like metal. Quinn's wallet containing a 10-dollar bill and seven identification and credit cards, his watch and a ring were taken from him. He then walked down the alley, ran home and called the police.

At approximately 10:30 the next morning, appellant was arrested. Quinn's watch was taken from his left wrist when he was booked about an hour later.

On August 17, between 4:15 and 4:30 p.m., in the presence of Ray Jelenicki, Russell Dutkiewicz, Richard Fraser and Anthony Laron, Officer Eastenson of the Los Angeles Police Department asked appellant where he got the watch. He stated that he got it from Jelenicki. Jelenicki stated that he sold the watch to appellant some time between the 15th of July and the 3d of August. Officer Eastenson pointed out to them

that their story was impossible because the watch was still in the owner's possession during that period. Neither Jelenicki nor appellant made any response to Officer Eastenson's statement.

In seeking reversal, appellant contends that (1) he was given no opportunity to plead to count three; (2) he was not aware that he was charged with count three when he came to court for trial on December 13, 1960; and (3) he had no knowledge that the watch was stolen until August 18. We find no merit in any of these contentions.

 With respect to appellant's first point, the court commented in *People* v. *Walker,* 170 Cal.App.2d 159, 164 [338 P.2d 536] : ''Where an information is amended, regular and orderly procedure requires the defendant be rearraigned and required to plead thereto before trial. In early years this was mandatory [citations], but the rule has been relaxed that if the defendant makes no demand or objection and is convicted upon a trial without having entered a plea the objection that there was no plea is waived and is unavailable to him.''

 The appellant pleaded not guilty to counts one and two of the original information. Later, an amended information was filed which charged him, in count three, with the crime of receiving stolen property. Although appellant in the presence of his counsel was arraigned on the amended information, the record fails to show that he entered a plea to count three. Jury trial was waived and the case was submitted on the testimony contained in the transcript of the preliminary hearing. It was on this count that he was found guilty.

The record shows that at all times the appellant was accorded the benefit of a plea of not guilty as to count three and that his failure to plead thereto did not affect his substantial rights nor prejudice his cause in any manner. Therefore, this was a mere irregularity and does not justify a reversal.

Pertinent here is the following from the decision in *People* v. *Walker, supra* (pp. 164-165) : ''. . . [W]e perceive here no violation of defendant's substantial or constitutional right or any prejudice to him because his plea was not entered to the amended charge, for he secured all the advantages of a plea of not guilty regularly entered. The cause proceeded to trial on his plea to the offense alleged in the original information and defendant at all times received the benefit of a plea of not guilty, since the cause was tried as though such a plea had been interposed to the amended information.

Defendant's substantial rights suffered no detriment by reason of the failure to repeat the plea [citation]. Under these circumstances, we are inclined to treat the failure to make the formal plea as a mere irregularity which in no manner or degree affected or impinged upon defendant's substantial rights [citation]. In addition, the record is silent concerning any objection before the lower court interposed by defendant to having the trial proceed without the entry of a new plea. He may not now complain on review where the error is not prejudicial [citation]."

Appellant's comment to the effect that he did not know that he was charged with count three prior to the time he came to court for trial on December 13, 1960, seems to suggest two ideas: (1) that the amendment was improper, and (2) that he had no opportunity to prepare for trial on this new charge. The answer to the first of these suggestions is found in section 1009 of the Penal Code. It provides that an information may be amended, in the discretion of the court, at any stage of the proceedings after a defendant pleads. Here, appellant had previously entered his plea as to counts one and two. It was therefore procedurally proper for the court to permit the amendment of the information to include count three—receiving stolen property.

The basic answer to appellant's second suggestion is also found in section 1009, Penal Code. Under its provisions, after an amendment and plea, ". . . the trial . . . shall continue . . . unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted." (*People* v. *Hembree,* 143 Cal.App.2d 733, 743 [299 P.2d 1043]). In this connection, it should also be noted that ". . . generally speaking, an accused may waive his statutory rights by merely failing to enter a timely objection." (*People* v. *Severino,* 122 Cal.App.2d 172, 181 [264 P.2d 656]; see also *People* v. *Suesser,* 142 Cal. 354, 357 [75 P. 1093].)

Appellant's trial was held on the same day that the amended information adding count three was filed. The record shows that appellant, who was represented by counsel, failed to object to the filing of the amended information and did not request a continuance to prepare for the trial of the charge contained in the new count. If he had shown on December 13 when he came to court for trial that he needed additional time to prepare his defense to the new and additional count, he would have been entitled to a reasonable postponement to

enable him to make such necessary preparation. However, he asserted no objection to the filing of the amended information nor did he request a continuance to prepare for trial. This right to a reasonable postponement of the trial is a statutory right which, under the authorities cited above, was waived by appellant's failure to make an appropriate request therefor when his case was called for trial.

In contending he was not aware that the watch was stolen until August 18, appellant apparently seeks to raise the point that the evidence was insufficient to show his knowledge that the watch was stolen. ▮ " '[P]ossession of stolen property, accompanied by no explanation, or an unsatisfactory explanation of the possession, or by suspicious circumstances, will justify an inference that the goods were received with knowledge that they had been stolen. The rule is generally applied where the accused is found in possession of the articles soon aftey they were stolen.' ▮ 'False or evasive answers to material questions with reference to the ownership of stolen property tend to prove such knowledge.' " (*People* v. *Lyons,* 50 Cal.2d 245, 258 [324 P.2d 556] ; see also *People* v. *Lopez,* 126 Cal.App.2d 274, 278 [271 P.2d 874] ; *People* v. *Reynolds,* 149 Cal.App.2d 290, 294 [308 P.2d 48].)

▮ Quinn's watch was taken from him on the night of August 15. Appellant was arrested the next morning at 10:30 and Quinn's watch was taken from his wrist when he was booked approximately an hour later. Officer Eastenson, in the presence of Jelenicki and others previously named, asked appellant where he had gotten the watch. Appellant stated that he had received it from Jelenicki. The latter stated that he sold the watch to appellant some time between the 15th of July and the 3d of August. Officer Eastenson then pointed out to them that their story was impossible because the watch was still in the possession of the owner during that period. Neither the appellant nor Jelenicki made any response to Officer Eastenson's statement.

From these facts : Quinn's watch was stolen on the night of August 15 ; it was taken from appellant's wrist when he was booked the next morning; appellant stated that he had received the watch from Jelenicki, who claimed that he had sold it to appellant between the middle of July and August 3d; Officer Eastenson pointed out to them the impossibility of their story; and neither made any reply nor offered any explanation, the court could reasonably draw the inference that the watch was received by appellant with the knowledge

that it had been stolen. Pertinent on this point is the statement of the court in *People* v. *Lyons, supra* (p. 258) : "The jury could find that defendant's statement to the police officer, shortly after his arrest, that the watch 'was his, that he had had it for some time' was a consciously evasive and misleading explanation. Under the authorities cited above this is sufficient to show a consciousness of guilt and justify an inference that defendant received the watch with knowledge that it was stolen."

The evidence and the inferences to be drawn reasonably therefrom support the finding that appellant was guilty of the offense of receiving stolen property.

In his brief appellant refers to a written statement signed by Jelenicki which states that the latter gave the watch to appellant when Jelenicki was being booked at the Los Angeles City Jail. ■■■ This statement was not introduced in evidence at the trial and cannot therefore be considered on appeal. On this point, the court in *People* v. *Ray,* 146 Cal. App.2d 257, 260 [303 P.2d 591], had this to say : ". . . 'matters raised in the brief, which appear to be merely unsworn statements of the defendant as to certain purported facts . . . not before presented to the trial court for consideration, cannot be considered on appeal.' " (See also *People* v. *Wren,* 140 Cal.App.2d 368, 370 [295 P.2d 54].)

Appellant, in his brief, also indicates that Quinn never identified him as one of the three men involved in the robbery. As the appellant was not convicted of robbery and is appealing from his conviction of receiving stolen property, his identification as one of the robbers is not a question to be considered on this appeal.

The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

[Civ. No. 25450. Second Dist., Div. Three. Apr. 18, 1962.]

ARTHUR HOWARD et al., Plaintiffs and Appellants, v. DOROTHY S. UPDIKE, Defendant and Respondent.

Gyler & Gottlieb and Norman H. Gottlieb for Plaintiffs and Appellants.

Denio, Hart, Taubman & Simpson and Roger W. Young for Defendant and Respondent.

SHINN, P. J.—Plaintiffs brought this action against Dorothy S. Updike, and others assigned fictitious names, for damages claimed as a result of Mrs. Updike's refusal to convey real property to them for a price of $40,000 in cash and on terms, pursuant to an oral agreement. Mrs. Updike alone appeared and filed a general demurrer to plaintiffs' second amended complaint, which was sustained without leave to amend, following which judgment was entered in her favor for costs. Plaintiffs appeal from the judgment.

The allegations of the second amended complaint were that Mrs. Updike owned the property as her separate property; she orally agreed to sell it to plaintiffs for the consideration above mentioned; plaintiffs and Mrs. Updike deposited with an escrow holder "a certain unsigned document entitled escrow instructions, a copy of which is attached to the complaint herein" and incorporated as if specifically set forth. It was also alleged that "defendants Updike and Doe II" deposited with the escrow agent an executed grant deed by which "defendants Updike and Doe I" purported to convey the property to plaintiffs, and that plaintiffs deposited in the escrow $1,000; four days after the date of the agreement and deposit of the deed "defendants Updike and Doe III" recalled the deed and refused to go further with the transaction. Damages of $12,000 were sought as the difference between the contract price and the market value of the property.

The proposed escrow instructions were not signed by any of the parties and no note or memorandum in writing of the transaction or the terms of it was executed.

Plaintiffs contend that the unsigned escrow instructions and the undelivered deed constituted a note or memorandum of the transaction sufficient to meet the requirements of section 1624 of the Civil Code and section 1973 of the Code of Civil Procedure, which are commonly known as the statute of frauds. These sections require, with respect to a purchase or sale of real property, a contract or note or memorandum thereof subcribed by the party to be charged or his agent, and section 1973 also provides that in the absence of such writing or secondary evidence thereof, evidence of the agreement shall not be received.

It is clear that the parties expected the escrow instructions to be signed, and that they were not relying upon any preliminary oral arrangements. It is also clear it was understood that without signed instructions the escrow holder would be without authority to do anything.

The deed executed by defendant Updike was in the hands of the escrow holder as her agent. The sum of $1,000 deposited by plaintiffs was held by the escrow holder as plaintiffs' agent.

''The escrow holder acts as agent of the buyer as to the money and as agent of the seller as to the deed until the stipulated conditions have been met. When performance has been rendered by each party the escrow holder then becomes the agent of the seller as to the money and the agent of the buyer as to the deed.'' (*Kellogg* v. *Curry,* 101 Cal. App.2d 856, 859 [226 P.2d 381].)

The escrow holder had no duty other than to return the deed upon demand of the grantors and to return the $1,000 to plaintiffs upon their demand.

Plaintiffs have cited a number of cases in which contracts were held to be sufficient, but in each of them there was a note or memorandum in writing which stated the terms of the contract and was signed by the party to be charged. Here there was no writing whatever signed by Mrs. Updike which stated the terms of an agreement to sell the property.

It is apparent that after three attempts to state a cause of action plaintiffs were relying upon nothing except an invalid oral agreement. It was not error to sustain the demurrer without leave to amend.

The judgment is affirmed.

Ford, J., and Files, J., concurred.

[Civ. No. 26305. Second Dist., Div. Four. Apr. 18, 1962.]

PEABODY SEATING COMPANY, INC., Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; AMERICAN SEATING COMPANY et al., Real Parties in Interest.

Nichols, Stead, Boileau & Lamb for Petitioner.

No appearance for Respondent.

Kirkpatrick & Kirkpatrick and MacFarlane, Schaefer & Haun for Real Parties in Interest.

THE COURT.—American Seating Company (hereinafter referred to as American) instituted a declaratory relief action naming as defendants the City of Long Beach (hereinafter referred to as City); Gust K. Newberg Construction Co. (hereinafter referred to as Newberg); Stanley Mattox, individually and doing business as Gymnastic Supply Company, and Gymnastic Supply Company, a corporation (hereinafter referred to as Gymnastic). The action involves a determination of the rights, duties and obligations of the parties in connection with the installation of stadium seats in a convention and exhibit hall being constructed for the City by Newberg.

The City submitted to various contractors for bids certain plans and specifications for the construction of the building, all bids to be submitted by August 17, 1960. Item 1 thereof, called the "Base Bid," provided for the installation of "hardwood type" stadium seating. The bidding instructions required the bidding contractors to also submit bids on Items 2, 3 and 4; Item 4, Alternate B, provided for the installation of an "upholstered type" chair. The instructions required the bidders to set forth the name and location of the place of business of each subcontractor who would perform labor or render services to the general contractor in the performance of said construction project in an amount in excess of one-half of one per cent of the general contractor's total bid.

Defendant Newberg, in its bid as submitted on August 17, 1960, designated the subcontractors who would perform labor and render services in the event the contract was awarded to it. It listed the name of Gymnastic Supply Company opposite the words "stadium seating." It did not separately name or designate a subcontractor to manufacture and install upholstered type seating.

Prior to the submission of bids to the City on August 17, 1960, American submitted to Newberg its bid of $213,000 for furnishing and installing the upholstered stadium seating under Bid Item 4, Alternate B. American alleges that this was the lowest bid; that Newberg used this bid in computing and submitting its bid to the City, but that Newberg inadvertently failed to designate American therein as such subcontractor; that prior to the letting of the general contract for said project, Newberg supplemented its bid by delivery to the City of a letter dated October 14, 1960, which states that "the upholstered seats which are to be furnished under Specification 31, Alternate #B, will be as furnished by the American Seating Company"; that the City awarded the contract to Newberg, exercised its option to have the upholstered type seat installed in lieu of the hardwood type, and incorporated a provision therefor into said contract.

Defendant Newberg has a contract with Gymnastic and intends to have Gymnastic install the upholstered type stadium seating manufactured by Peabody Seating Company, petitioner herein. Prior to the submission of Newberg's bid to the City, Gymnastic did not submit to Newberg a bid for the upholstered type seating. It is the position of Newberg that in designating Gymnastic as the subcontractor who would install the stadium chairs, it intended such subcontractor to install the stadium chairs regardless of which type would be finally installed; that the specification of the name of the manufacturer was not required under the Municipal Code or the bidding instructions; that both types of chairs are fixtures, thus it was not, in any event, required to specify in its bid the subcontractor who would furnish and install said chairs; and that under its contract with the City it is entitled to furnish any one of three seats approved by the architect[1] and may have such seats furnished by any person, firm or company that it desires. Newberg further asserts that it inadvertently advised the City in its letter of October 14, 1960, that the stadium seats would be manufactured by American; that thereafter it discovered its error and on December 31, 1960, advised the City that its subcontractor Gymnastic would furnish chairs manufactured by Peabody Seating Company (hereinafter referred to as Peabody). Newberg asserts

[1]The City alleges that it approved for installation upholstered seats as manufactured by American Seating Company, Haywood-Wakefield, model TC 700, and Peabody Seating Company.

that it at no time advised American that it intended to designate or had designated it as a subcontractor or supplier under its contract with the City; that there was no contractual obligation between itself and American.

American contends that the designation by Newberg of Gymnastic as a subcontractor to install the stadium chairs under the ''Base Bid'' is not a designation of the subcontractor to furnish and install the upholstered seating under Bid Item 4, Alternate B; that, based upon applicable laws and ordinances, its negotiations with Newberg resulted in a contract; that its written bid was orally accepted; that American is obligated to Newberg to furnish and install upholstered seating per said bid; that the designation of American in the October 14 letter was a correct and proper designation of a subcontractor which cannot be changed; that Newberg is under a contractual obligation to the City to provide seating manufactured by American, and that Newberg is estopped from providing the upholstered seat under Bid Item 4, Alternate B, manufactured or installed by any person or firm other than American.

The issues as framed by the above named parties in the pretrial statement of November 16, 1961, at which time trial was set for December 19, 1961, are as follows: 1. Was the naming or designation of a subcontractor to furnish and perform stadium seating required in connection with the submission of bids on the subject project? 2. Was there an effective designation or naming of the subcontractor to perform the ''upholstered type'' stadium seating as provided in section 31 of the specifications, Bid Item 4, Alternate B? 3. If so, can the subcontractor manufacturing, furnishing or installing the stadium seating upon the construction project be changed or substituted under the facts and circumstances herein? 4. Declaration of the contractual obligations pertaining to stadium seating between the City and Newberg. 5. Determination of the rights and obligations between American and Newberg; what contractual obligation, if any, existed between these two parties. 6. Is the doctrine of estoppel applicable? 7. Is the doctrine of laches applicable?

Due to a congested court calendar, trial date was continued from December 19 to December 20, 1961, on which date counsel for Gymnastic moved that Peabody be joined as an indispensable party under Code of Civil Procedure, section 389. The court made its order that Peabody (and General

Seating Company)[2] "be brought into this action and be deemed as parties defendant herein" and the cause was continued to January 30, 1962. On December 27, 1961, petitioner was served with summons, complaint and pretrial orders.

On January 30, American moved for separate trials, requesting that the trial involving the original parties be made separate from the one involving Peabody. The motion was denied that date. Also, on January 30, the court sustained the special demurrer of Peabody (filed the previous day), "plaintiff to amend as to defendant Peabody Seating Co. by February 6, 1962." Trial was continued to March 8, 1962. American states that it declined to amend the complaint "inasmuch as it had no knowledge or information of any facts which would in any way state a cause of action against said Peabody Seating Co., Inc."

On March 5 (three days before trial) Peabody filed an answer and cross-complaint. It also filed a motion to set aside and vacate the pretrial order and the trial date, to nullify all pretrial proceedings, and to place the matter off the civil action list. The motion was taken under submission, resulting in a further continuance of the trial date to March 28. The cross-complaint alleges the contract between Newberg, as general contractor, and Gymnastic and General Seating Company, as subcontractors to supply and install the stadium seats; that Peabody thereafter contracted with said subcontractors for the manufacture of said seats; and that, pursuant to said contract, it has expended considerable money in the manufacturing process generally and in the purchase of materials. The cross-complaint and the answer thereto present no new or additional controversy. Peabody merely disputes the contention of American that it has a contract with Newberg, and claims that the contract between Newberg and Gymnastic is valid.

On March 6, American filed a motion to strike the answer and cross-complaint, or for separate trials. On March 13, the following minute order was made: "Motion to strike answer and cross-complaint is denied. Motion for separate trials is granted so that issues framed by existing pre-trial orders shall be heard in one trial and all other issues now or hereafter arising, are [sic] particularly those in the pleadings of

---

[2] The demurrer to the complaint of General Seating Company was sustained without leave to amend on January 23, 1962.

Peabody Seating Company shall be separately tried."[3] The trial judge expressed the opinion that Peabody was but a supplier of goods and should not have been made a party to the action in the first place; that it was not an indispensable party. Peabody moved for an ex parte order revoking the order of March 13 under Code of Civil Procedure, section 1008, claiming that the same motion had earlier been denied. This motion was denied.

On March 26 (two days before trial) Peabody again moved for a continuance of the trial based upon the fact that it was going to appeal the order granting separate trials. Upon the ground that it was a nonappealable order, the motion was denied.

Thereupon, on March 27, the within petition for a writ of prohibition was filed seeking an order restraining respondent court from trying the issues separately as to petitioner and ordering the court to revoke the order for separate trials. It is petitioner's position that it is an indispensable party and that it is only as to a "conditionally necessary party" that a court has jurisdiction to order separate trials. (Code Civ. Proc., § 389.)

Code of Civil Procedure, section 389, provides: "A person is an indispensable party to an action if his absence will prevent the court from rendering any effective judgment between the parties or would seriously prejudice any party before the court or if his interest would be inequitably affected or jeopardized by a judgment rendered between the parties.

"A person who is not an indispensable party but whose joinder would enable the court to determine additional causes of action arising out of the transaction or occurrence involved in the action is a conditionally necessary party. . . .

"If, after additional conditionally necessary parties have been brought in pursuant to this section, the court finds that the trial will be unduly complicated or delayed because of the number of parties or causes of action involved, the court may order separate trials as to such parties or make such order as may be just."

It is well settled that if a court attempts to proceed in an action without the presence of indispensable parties it acts beyond its jurisdiction and may be restrained by prohibition. (*Bank of California* v. *Superior Court*, 16 Cal.2d 516, 522-523 [106 P.2d 879].) But "[w]hen he is

[3]By reason of this order, the court on March 14, denied the motion of Peabody to vacate the pretrial order and trial date.

found to be a proper or necessary party proceeding in his absence is not jurisdictional but error at the most, dependent upon the circumstances.'' (*Harrington* v. *Evans*, 99 Cal.App. 2d 269, 271 [221 P.2d 696].)

With reference to section 389 of the Code of Civil Procedure, it is stated in *Bowles* v. *Superior Court*, 44 Cal.2d 574, 583 [283 P.2d 704] : ''As pointed out in *Bank of California* v. *Superior Court*, 16 Cal.2d 516, 521 [106 P.2d 879], in applying this section, a distinction has been drawn between necessary and indispensable parties. Where persons are so interested in the controversy that they should normally be made parties in order to enable the court to do complete justice, but their interests are separable from the rest, they are necessary but not indispensable parties. On the other hand, one may be an indispensable party if his interest in the subject matter of the controversy is of such a nature that a final decree cannot be rendered between the other parties to the suit without inevitably affecting that interest.''

In the instant case the real object of American's action is to establish the existence of a contract between itself and Newberg, or a legal obligation on the part of Newberg in favor of American by reason of certain ordinances and Newberg's contract with the City. This involves a determination also of the validity of the contract between Newberg and Gymnastic. The controversy involves the legal rights and duties of the parties to such contracts only, a conclusive determination of which may be had without the presence of Peabody; nor will the absence of Peabody prejudice any of these parties. (See *Goldsworthy* v. *Dobbins*, 110 Cal.App.2d 802, 807 [243 P.2d 883] ; *John* v. *Marshall*, 103 Cal.App.2d 172, 183-184 [229 P.2d 367] ; *Caldwell* v. *Regents of University of Cal.*, 35 Cal.App. 639, 640 [170 P. 666] ; *Baines* v. *Zuieback*, 84 Cal.App.2d 483, 492-493 [191 P.2d 67] ; *First Nat. etc. Bank* v. *Superior Court*, 19 Cal.2d 409, 415 [121 P.2d 729] ; *Jollie* v. *Superior Court*, 38 Cal.2d 52, 59 [237 P.2d 641] ; *Simmons* v. *California Institute of Technology*, 34 Cal.2d 264, 276 [209 P.2d 581].)

Petitioner claims, however, that its ''interest would be inequitably affected or jeopardized by a judgment rendered between the parties.'' (Code Civ. Proc., § 389.) Obviously Peabody has an interest in knowing whether the right and duty to furnish the stadium seats belongs to American or Gymnastic, but such ''interest'' is but consequential and economic; it is not a legal interest in the subject matter of

the controversy and Peabody can claim no rights under a judgment in the declaratory relief action.

As stated by Professor Edwin Borchard, Declaratory Judgments (2d ed.) page 259:　　 "Legal interest is the criterion of joinder; . . . " (Cf., *Schriber Sheet Metal & Roofers* v. *Shook*, 64 Ohio App. 276 [28 N.E.2d 699, 703]; *Miller* v. *City of Phoenix*, 51 Ariz. 254 [75 P.2d 1033]; *Ex-Cell-O Corp.* v. *City of Chicago*, 115 F.2d 627.) Peabody is not a party to any of the contracts mentioned in the declaratory relief action and claims an interest in the controversy solely by reason of its contract with Gymnastic. It has no more interest in the matter than numerous other suppliers of goods or materials to a subcontractor. A judgment in the action will not result in a termination or forfeiture of its contract with Gymnastic (Cf. *Hartman Ranch Co.* v. *Associated Oil Co.*, 10 Cal.2d 232, 263-265 [73 P.2d 1163]; *Thomson* v. *Talbert Drainage Dist.*, 168 Cal.App.2d 687, 690 [336 P.2d 174]), and it need not determine, nor will it directly affect, Peabody's legal rights or remedies under its contract.　　 In speaking of parties not indispensable, the court states in *Bank of California* v. *Superior Court, supra,* 16 Cal.2d 516, 523: "The other classification includes persons who are interested in the sense that they might possibly be affected by the decision, or whose interests in the subject matter or transaction are such that it cannot be finally and completely settled without them; but nevertheless their interests are so separable that a decree may be rendered between the parties before the court without affecting those others. These latter may perhaps be 'necessary' parties to a complete settlement of the entire controversy or transaction, but are not 'indispensable' to any valid judgment in the particular case. They should normally be joined, and the court, following the equity rule, will usually require them to be joined, in order to carry out the policy of complete determination and avoidance of multiplicity of suits. But, since the rule itself is one of equity, it is limited and qualified by considerations of fairness, convenience, and practicability."

It does not appear from the record that the trial court, in ordering that petitioner be brought into the case, did so on the basis that it was an indispensable party. At the time of making that order the court stated: "I will make an order that the plaintiff include them in the action and serve them with process and a copy of pleading that involve them, and they are involved in this case, so that they may make a defense

if they care to by filing an answer or doing whatever else they, under the law, desire to do. That is all that I am saying is that they should be given the opportunity by being served, if that can be done. If they can't be served, then they can't, and then you can proceed from there. I will order that be done."

Nor did the court, in denying the order for separate trials on January 30th necessarily do so on the ground that Peabody was an indispensable party. We do not know the basis of that ruling. But the record shows only that, at that time, Peabody had been made a party defendant. Its demurrer was filed after the filing of the motion and had not been ruled upon. Subsequent to this ruling, and prior to the order of March 13, granting separate trials, Peabody had filed its answer and cross-complaint showing that it was not a party to the contracts mentioned in American's complaint; that it was but a supplier of materials to a subcontractor (Gymnastic) involving an entirely different contract. Thus the order of March 13 was made upon a completely different showing.

It is our conclusion that the trial court found, and the record indisputably shows, that Peabody is not an indispensable party. Thus the court acted within its discretion in ordering separate trials and the question of jurisdiction is not involved.

The alternative writ is discharged and the peremptory writ is denied.

[Civ. No. 6856. Fourth Dist. Apr. 18, 1962.]

JOSEPH P. LATTANZI, a Minor, etc., Plaintiff and Appellant, v. SAN MORITZ CLUB et al., Defendants and Respondents.

Otis Babcock and Roy S. Giordano for Plaintiff and Appellant.

Chase, Rotchford, Downen & Drukker, Henry J. Bogust and William G. Tucker for Defendants and Respondents.

GRIFFIN, P. J.—This is an appeal by a minor plaintiff and appellant, Joseph P. Lattanzi, by his guardian *ad litem,* from a judgment in favor of defendants and respondents San Moritz Club, a corporation, and Blake Woodcox, entered by the trial court after a trial without a jury.

The evidence discloses that the plaintiff was injured on November 26, 1958, a week before his 18th birthday, at an ice-skating rink on the premises owned and operated by the San Moritz Club. Plaintiff's foot was cut when it came in contact with a part of an ice-shaving machine owned by the defendant Club. The part of the machine involved was a rotating scraper, variously referred to as a "rotating cylinder," "rotating drum," or "roller." Apparently, this roller was about three feet in length and four inches in diameter, located somewhat like the brush in an upright vacuum cleaner, and the roller had teeth in it about one-half inch long which came in contact with the ice when it was in operation and shaved or scraped the top of the ice over which the machine traversed. These blades served the dual function of shaving the ice and pulling the machine in a forward motion over the ice. The machine contained a device whereby the roller could be lifted approximately two to two and one-half inches off of the ice when the machine was not in operation. When the roller is in this "idling position," it continues to rotate if the machine is not turned off. When in use, the protective guard or device is about one-half inch from the ice.

Defendant Woodcox was the manager of the skating rink at the time plaintiff was injured and he operated the machine in plaintiff's view for some length of time before the accident. The evidence is in conflict as to whether the plaintiff rode on it for 20 minutes to a half hour immediately before the acci-

dent as he claimed. Woodcox testified that he did not remember his being on it but he did observe him, for the first time, coming across the ice without skates in a sliding walk, with his shoes on, and that he slid his foot under the machine. Woodcox testified that he previously had warned plaintiff not to come onto the ice with shoes and no skates; and he repeated the warning when he saw him taking off his skates just before the accident. Plaintiff testified that as he approached the machine, he was aware that it was lifted off of the ice and that he "guessed" that it was about two or three inches in the air; that a gasoline motor operated it and it was making quite a noise, but he said he wasn't paying any attention to the machine, and knew the ice was slippery. The evidence shows that plaintiff observed the machine cut into the ice and through ice while it was in operation and that he knew the principle of its operation; that during this period the machine had been raised into the idling position two or three times. Plaintiff testified that he was riding on the machine to weight it down and that it had been placed in idling position by Woodcox; that he went over to the bench some 15 feet away to obtain a cushion and that he came back toward the machine and started an intentional "sliding motion" toward Woodcox and while still in this "sliding motion," his foot came in contact with the rotating cylinder while the machine was in idling position. Plaintiff was wearing street shoes at the time. Plaintiff's purpose in coming to the skating rink was to skate and later to perform certain services for which he would be given the privilege of skating. He testified that he did not know that there was no complete guard around the roller when it was in the idling position, but he admitted that he knew that the blade was raised about three inches off the ice and continued turning in this position. He admitted that when he approached the machine he knew the ice was slippery and that there were chips of ice, snow and ice residue in the area, but he said he wasn't thinking about the machine as he came back to it. He suffered considerable injury to his foot by the rotating drum. The record shows that immediately after the accident defendant placed plaintiff's name on the payroll so that he could obtain proper medical care.

After trial, the court found generally in favor of defendants and against plaintiff and found plaintiff was an invitee upon the premises and that neither defendant was negligent in any manner; that the condition of said ice machine and said premises was open and *obvious* to all persons, including

plaintiff; that no finding on the question of contributory negligence or assumption of risk was made in view of the fact that no negligence of defendants was shown. Other named defendants were dismissed from the action. Judgment was entered accordingly.

On this appeal, plaintiff claims: (1) insufficiency of the evidence to support the judgment; (2) the evidence shows conclusively that the mechanism in question was dangerous and that there was a duty to warn the plaintiff of the danger and that no warning was given; (3) the evidence also shows conclusively that there was a violation of safety orders and accordingly there was negligence on the part of defendants; and (4) the findings are fatally defective in failing to find on the question of a violation of the safety orders or regulations.

### SUFFICIENCY OF EVIDENCE AND DUTY TO WARN

The main, if not the sole, argument in this respect is that there was a dangerous condition of the machine and since plaintiff was an invitee he was entitled to a warning of such dangerous condition. It is true that a landowner owes a duty to an invitee of warning of an existing dangerous condition, but there is no such duty where the dangerous condition is so obvious that the invitee could reasonably be expected to see it. (*Mula* v. *Meyer,* 132 Cal.App.2d 279 [282 P.2d 107].) The trial court's memorandum opinion recognized this proposition and said:

''The ice shaving machine in the instant case is one whose dangerous aspects are obvious. It was operated by a gasoline motor with such power and force as to shave the ice and to throw it aside, when the machine was in operation. It appears from the photograph of it in evidence that it consists, among other things, of a chain drive, which obviously is noisy, and the plaintiff testified that he had watched it for a period of at least an hour prior to the accident. It would seem that the danger thus involved is an obvious one and one of which the defendant has no duty to warn. In fact, it is difficult to conceive of what the defendant's agents might say which would be any more impressive warning than the machine itself in operation.''