[Crim. No. 5423. In Bank. Aug. 14, 1953.]

THE PEOPLE, Respondent, v. ARTHUR CISTO CARNINE, Appellant.

Paul Golis and Maurice Fredericks, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier, Deputy Attorney General, Joseph Maddux, District Attorney (Sonoma), and William G. Luckhardt, Deputy District Attorney, for Respondent.

TRAYNOR, J.—This appeal is from a judgment imposing the death penalty following defendant's conviction of first degree murder.

The following facts are undisputed: On September 9, 1952, defendant came to Santa Rosa from his mother's and stepfather's home a short distance out of town. He arrived before noon and spent most of the afternoon in the Lido Bar drinking beer and talking to the bartender and other patrons. About 5 p.m. he left the bar and went to Mr. Rosenbaum's near-by clothing store. He observed a salesman with a sample case talking to Mr. Rosenbaum and did not enter. He walked round the block, returned to the Lido Bar, and about 15 minutes later returned to Mr. Rosenbaum's store. Mr. Rosenbaum was then alone, reading a newspaper. Defendant entered the store, and after conversing with Mr. Rosenbaum, struck him twice on the side of the face and head. Mr. Rosenbaum fell to the floor, and defendant dragged him into a washroom toward the rear of the building. Defendant took money from his wallet, packed a suitcase with clothing from the store, and took it with him when he left the scene in Mr. Rosenbaum's car. He waited on one or two customers before he left the premises. Two days later Mr. Rosenbaum's body was discovered in the washroom. There was a leather thong tied around his neck and several small puncture wounds in the upper part of his body. Death was caused by shock and hemorrhage owing to laceration of the face and scalp and congestion and edema of the lungs owing to strangulation. After leaving the store, defendant drove to his parents' home and then to a ranch where he had been employed. Later he returned to Santa Rosa, where he left Mr. Rosenbaum's car.

On the evening of the 11th, the same day Mr. Rosenbaum's body was found, he took a bus to San Francisco where he was apprehended.

Defendant pleaded not guilty and not guilty by reason of insanity. He testified that he went to the store to buy work clothes. Mr. Rosenbaum was a friend of his and had lent him $25, which defendant had not repaid. After he had bought the clothes he had an argument with Mr. Rosenbaum about the loan. He struck Mr. Rosenbaum twice but did not intend to kill him. He did not remember dragging him into the washroom or tying the thong round his neck or stabbing him. It was not until after he had left Mr. Rosenbaum in the washroom and had started to leave the store that he decided to return and take the money, clothing, and the car.

Although there is no dispute that defendant had been drinking before he attacked Mr. Rosenbaum, witnesses who saw him both shortly before and after the crime testified that he was not intoxicated. He remembered and described most of the events that occurred at the time. In a statement made to the district attorney and the police the day after his arrest, he said that he had bought the work clothes from Mr. Rosenbaum earlier in the day and not at the time of the attack. In that statement he made no reference to a quarrel about a loan.

On the trial of the issue of not guilty by reason of insanity, four psychiatrists testified, one for the prosecution and three who had been appointed by the court. They were all of the opinion that defendant was legally sane at the time of the commission of the crime. Testifying in his own behalf, defendant described some of his background and past experiences. He stated that he knew it was wrong to kill except when in military service or in self-defense. None of the psychiatrists were of the opinion that anything in defendant's testimony indicated legal insanity. No witness testified that defendant was legally insane.

The foregoing evidence is sufficient to support a finding that defendant committed the homicide in the perpetration of robbery or burglary, that he was legally sane at the time of the crime, and that he is therefore guilty of murder of the first degree. (Pen. Code, § 189.) Defendant contends, however, that the trial court committed prejudicial error by refusing to instruct the jury on his theory of the

case. He offered the following instruction, which the trial court refused to give on the ground that it was not the law.

"If you find that Defendant ARTHUR CARNINE had not formed an intention to rob Isroil Rosenbaum until after he struck Isroil Rosenbaum, dragged his body into the washroom, and left his body lying on the floor of the washroom; then you are instructed that Isroil Rosenbaum was not killed by ARTHUR CARNINE in the perpetration of or an attempt to perpetrate, the crime of robbery."

■ According to defendant's testimony he never intended to kill Mr. Rosenbaum and did not decide to take the property until after the attack had terminated. As stated in *People v. Kerr,* 37 Cal.2d 11, 13-14 [229 P.2d 777], where the same defense was advanced in a similar factual situation, "It is true that if defendant's thoughts followed the course described by him the killing would not be first degree murder in the perpetration of robbery. [Citations.]" Accordingly, the instruction should have been given.

■ It can not reasonably be contended that the error was cured by the following general instructions with respect to murder that were given by the court.

"Murder which is committed in the perpetration or attempt to perpetrate the crime of robbery, is declared by law to be murder of the first degree, and if you should find, beyond a reasonable doubt and to a moral certainty, that the defendant, Arthur C. Carnine, killed Isroil Rosenbaum in the perpetration or attempt to perpetrate the crime of robbery, as those terms are defined herein, you will have no choice but to designate the offense as murder in the first degree.

"Murder which is committed in the perpetration or attempt to perpetrate the crime of burglary, is declared by law to be murder of the first degree, and if you should find, beyond a reasonable doubt and to a moral certainty, that the defendant, Arthur C. Carnine, killed Isroil Rosenbaum in the perpetration or attempt to perpetrate the crime of burglary, as those terms are defined herein, you will have no choice but to designate the offense as murder in the first degree.

"Robbery is defined by Section 211 of the Penal Code as follows: 'Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.'

"In so far as this case is concerned, the crime of burglary is defined by section 459 of the Penal Code as follows: 'Every

person who enters any . . . store . . . or other building with intent to commit grand or petit larceny or any felony, is guilty of burglary.'

"The word 'perpetration' as used in these instructions, is defined as the doing or performance or commission of an act consciously or with a guilty intent, to commit the offense or offenses charged as a wicked deed.

"If you find that the defendant Arthur Carnine had not formed an intention to burglarize Isroil Rosenbaum's store until after he struck Isroil Rosenbaum, dragged his body into the washroom and left his body lying on the floor of the wash-room—if he did such acts, then you are instructed that Isroil Rosenbaum was not killed by Arthur Carnine in the perpetration of, or an attempt to perpetrate, the crime of burglary."

There is nothing in the foregoing instructions that sets forth defendant's defense to the charge of murder committed in the perpetration of robbery. It is not improbable that the jury concluded that a lethal assault followed by a stealing of the victim's property constituted murder in the perpetration of a robbery even though the intent to steal was not conceived until the assault had terminated. The instructions not only left the door open to such a conclusion, but by specifically pointing out that in the case of murder committed in the perpetration of burglary the criminal intent must have been formed before defendant entered the store, they suggested that the time at which defendant formed the intent to steal the property was irrelevant in the case of murder committed in the perpetration of robbery.

Since defendant admitted that he had attacked Mr. Rosenbaum and thereafter had stolen his property, his only available defense, aside from insanity, to the charge of murder of the first degree was that set forth in the refused instruction. Although the jury was not required to accept defendant's testimony that he never intended to kill Mr. Rosenbaum and that he did not decide to steal his property until after the assault was completed (*People* v. *Kerr, supra,* 37 Cal.2d 11, 14), he was entitled to have them properly instructed on the defense raised thereby. (*People* v. *Carmen,* 36 Cal.2d 768, 772-774 [228 P.2d 281], and cases cited.)

This court cannot weigh the evidence to determine whether defendant's testimony was true or false. That question was for the jury. Under the instructions given it is impossible to conclude from the verdict that the jury disbelieved him and accordingly found against his only available

defense. ■ As stated in *Daniels* v. *City & County of San Francisco*, 40 Cal.2d 614, 623 [255 P.2d 785], "It is the duty of the court to instruct on every theory of the case finding support in the evidence. [Citations.] The ordinary rules on appeal sustaining a general verdict which the evidence on one of several issues upholds [citations] has no application here where plaintiffs' theory of recovery was not even presented to the jury as an issue affecting their right of recovery. [Citations.]"

■ Even if we were at liberty to weigh the evidence to determine what credence the jury might have given defendant's testimony had its relevance been pointed out to them, we could not say that the evidence preponderated against the truth of his version of his mental processes. Defendant is 21 years of age. His formal education ended with the sixth grade, although he had some further education during the period of approximately two years he spent in the army after enlisting at the age of 16. After leaving the army he wandered about the country working for brief periods at various jobs. Several months before the crime he came to Santa Rosa to live with his mother and stepfather. He soon left Santa Rosa, however, and did not return until shortly before the crime. The day before the crime he secured employment as a milker at a ranch. The following morning he borrowed $10 from his stepfather to buy work clothes and walked into town. He visited various bars and poolhalls looking for friends and bought a half pint of whiskey and drank it. About 2:30 in the afternoon he went to the Lido Bar where he stayed until he left to go to Mr. Rosenbaum's store. While at the bar he drank from four to eight beers and one whiskey. He testified that Mr. Rosenbaum was a friend of his and that the reason he did not enter the store when he first went there was that he saw that Mr. Rosenbaum was busy and he did not wish to disturb him. He returned to the Lido Bar, had another beer, and then returned to Mr. Rosenbaum's store. After he had attacked Mr. Rosenbaum and left him lying in the washroom he waited on two customers. He made no effort to hurry them out of the store, but urged one of them to buy something else after he was unable to find what the customer originally wanted. In addition to the money he found in Mr. Rosenbaum's wallet, he took a suitcase and a box or boxes packed with clothing of assorted sizes. He then took Mr. Rosenbaum's car and drove to the ranch where he was employed. On the way he drove

into a ditch and got other employees of the ranch to pull the car out. He unloaded the clothing and later drove back to town where he left the car. Later in the evening he took a taxi to various bars and then back to the ranch. During the evening he drank so much that the foreman was unable to awaken him for the morning milking, and he was fired. Later in the day he borrowed five dollars from his stepfather and went to the Russian river with his cousin where they canoed and drank whiskey. The following evening he decided to leave town and took a bus to San Francisco. He took some of the clothing he had stolen with him and left the rest at his mother's and stepfather's cabin. The testimony of various witnesses suggests that defendant had a rather easygoing, happy-go-lucky disposition. He owned a gun, but he did not use it in the commission of the crime.

The foregoing evidence is not inconsistent with defendant's testimony that his attack on Mr. Rosenbaum was the result of a sudden quarrel and that the taking of the property was an afterthought. It is inconsistent with the theory of a planned robbery or burglary. Defendant did not enter a store where he was unknown or where he could expect to find any large amount of money. He made no appreciable effort to conceal his crime. Not only did he expose himself to witnesses at the scene, but he drove his victim's car to the ranch where he worked and enlisted the aid of people who knew him to pull the car out of the ditch. Had he killed Mr. Rosenbaum to prevent his identification as a robber it is unlikely that immediately thereafter he would leave a trail so easily followed. The evidence presents a picture of a crime committed by a person whose behavior was generally erratic and who at the time was at least partially under the influence of alcohol. The crime had few, if any, of the indicia of careful planning. Under these circumstances it was a close question whether defendant first decided to rob Mr. Rosenbaum and then killed him in the perpetration of that robbery or first attacked him without premeditation and only thereafter decided to steal his property.

It can not be inferred from the fact that the jury brought in a verdict of murder of the first rather than of the second degree that it decided this question against defendant. The instructions on second degree murder carefully pointed out that murder could not be of the second degree if it was committed in the perpetration of a robbery or burglary. Thus these instructions referred the jury to those defining murder

committed in the perpetration of a robbery or burglary, and as pointed out above, none of the latter instructions explained to the jury defendant's only defense to the charge of murder committed in the perpetration of a robbery.

█ In determining whether the error was prejudicial, it bears emphasis that the burden was on the prosecution to prove defendant guilty of murder of the first degree beyond a reasonable doubt. It was not incumbent upon defendant to convince the jury that his version of what occurred was true.

█ He was entitled to be found guilty of no more than murder of the second degree if his testimony viewed in the light of the other evidence was sufficient to create a reasonable doubt as to his guilt of murder of the first degree. █ Under these circumstances we cannot say that a different verdict would have been improbable had the requested instruction been given. Accordingly, the error constituted a miscarriage of justice within the meaning of article VI, section 4½ of the Constitution. (*People* v. *Newson,* 37 Cal.2d 34, 45 [230 P.2d 618]; *People* v. *Hamilton,* 33 Cal.2d 45, 51 [198 P.2d 873].)

The judgment is reversed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., and Spence, J., concurred.

Edmonds, J., concurred in the judgment.