[Crim. No. 5688.   In Bank.   Sept. 20, 1955.]

THE PEOPLE, Respondent, v. PAUL HUDSON, Appellant.

Charles W. Jennings, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

TRAYNOR, J.—This appeal is from a judgment imposing the death penalty following defendant's conviction of first degree murder.

The following facts are undisputed: At approximately 2 p. m. on July 6, 1954, defendant was drinking beer in a bar, the Black Cat Café, in the town of Stratford. Shortly thereafter William Tuttle came into the bar wearing a distinctive black hat. He and defendant engaged in conversation. At that time defendant had no money and Tuttle bought him a beer. Between 2:30 and 3 p. m. defendant and Tuttle left the bar together, taking four cans of beer with them. Defendant told the bartender that they were going for a ride. They were next seen sitting together in Tuttle's green 1952 Ford pickup truck, which was parked by a clump of shade trees near the edge of town. Thereafter they went to Tuttle's cabin, which was located in an agricultural labor camp outside of Stratford. They remained at the cabin for half an hour drinking beer before they started back to town. The drive back was interrupted by Tuttle's wish to urinate. Both defendant and Tuttle alighted from the truck at a point along a rural road. Defendant hit Tuttle on the side of the face with his fist. The blow knocked Tuttle to his hands and knees, whereupon defendant kicked him about the head, and he fell to the ground. Defendant moved him a few feet away from the side of the road but did not hide the body. He then took Tuttle's purse and drove away in Tuttle's truck. The body was found three days later. It was in a "fairly advanced" state of decomposition, but an autopsy showed that death was caused by cerebral concussion and hemorrhage and by a compound fracture of the jaw, both owing to blows about the head and face. In his testimony at the trial, the autopsy surgeon stated that the concussion,

hemorrhage, and fracture were combined causes and that one of them could not be singled out as the sole cause of death. Within an hour after having left with Tuttle, defendant returned to Stratford driving Tuttle's truck and wearing Tuttle's black hat. He went into the Black Cat Café and paid for the beer that he had purchased on credit earlier in the day before leaving with Tuttle. He also bought drinks for everybody in the bar and bought 24 cans of beer and two hamburgers to take with him. On leaving the Black Cat Café, he went across the street to a grocery store, where he was known, and bought a pint of whiskey and some luncheon meat. He put his purchases in Tuttle's truck and started to drive out of town. He stopped at a service station to buy gas and oil for the truck. He drove away and had an accident at the edge of town in which the truck was turned over and his right foot severely cut. He urged two witnesses to the accident not to call an ambulance or the police and stood talking with them until his brother arrived and drove him to his brother's home just outside of Stratford. Defendant stayed there overnight. On the following day, his brother drove him to Corcoran where he took a cab to Fresno. After staying in Fresno overnight, he boarded a bus for Arizona. He ultimately made his way to El Paso, Texas, where he called on the sheriff's office and the highway patrol for help in entering a hospital to obtain treatment for an infection in his injured foot. He was apprehended before leaving the hospital, in which he had registered under his own name, and returned to Kings County to stand trial on charges of murder, robbery, and theft of a vehicle (Veh. Code, § 503)

Defendant pleaded not guilty and not guilty by reason of insanity. In his testimony at the trial, however, he admitted the robbery and the theft of the vehicle. He also admitted that he had struck Tuttle in the face with his fist and that he had kicked him about the head. He explained that he and Tuttle had been discussing the possibility of defendant's buying the truck from Tuttle and that on the way back to Stratford defendant had asked permission to drive in order "to try it out." Tuttle gave his permission but when they stopped at the place where the killing occurred they had an argument over Tuttle's complaint that defendant was driving too fast and recklessly. Defendant testified that the blows were the result of this argument and that he did not form an intent to rob until after the attack had ceased: "Mr. Tuttle gets out of the car on the opposite side of the driver.

1 got out of the car. I come around to the front of the car and we got in a little argument there. Well like the testimony said that he was going to pass water so when he started to do that I hit him and knocked him down. He was down on all fours, I knew that I was on parole,* just out of the penitentiary and I knew that would mess me up right there so I kicked the man and when I kicked him he went on down, *and I decided then I got to take his money and get out of here for I haven't got any.* So I took his money and from where I left the man when they found the body it was at least ten feet from where I left it. The reason I moved the body from what they say was out from under the wheels of the back of the car was I wouldn't run over him.'' (Italics added.)

In rebuttal, the prosecution offered in evidence a pretrial confession. Defendant objected to its introduction on the ground that it was involuntary in that it had been obtained by the use of a threat by the sheriff of Kings County. Defendant testified that the sheriff threatened to do everything in his power to send defendant's brother to the penitentiary unless defendant confessed. Defendant's brother was mentally deficient and had been in a mental institution, and defendant was anxious to shield him. The sheriff denied making the threat, however, and the trial judge admitted the confession. In the confession defendant admitted the robbery, the theft, and the assault on Tuttle. He also said that he had formed the intent to rob before he and Tuttle had gone to the latter's cabin and thus before any blows had been struck.

On the plea of not guilty by reason of insanity, defendant waived a trial by jury. The only evidence introduced was the written opinion of the two psychiatrists who were appointed by the court to examine defendant. They agreed that defendant was legally sane at the time of the crime, and the court found accordingly.

■ Even if the contested confession is disregarded, the foregoing evidence is sufficient to support a finding that defendant committed the homicide in the perpetration of a robbery, that he was legally sane at the time of the crime, and that he is therefore guilty of murder in the first degree. (Pen. Code, § 189; *People* v. *Carnine,* 41 Cal.2d 384, 387 [260 P.2d 16].) ■ Defendant contends, however, that the trial

*Defendant was on parole from Soledad Prison where he had been confined after having been convicted of passing fictitious checks.

court committed prejudicial error by refusing to instruct the jury on his theory of the case. He offered the following instruction, which the trial court refused to give:

"If you find that Defendant, PAUL HUDSON had not formed an intention to rob WILLIAM TUTTLE until after he struck WILLIAM TUTTLE, dragged his body into the ditch then you are instructed that WILLIAM TUTTLE was not killed by PAUL HUDSON in the perpetration of or attempt to perpetrate the crime of robbery."

In *People* v. *Carnine*, 41 Cal.2d 384 [260 P.2d 16], the failure to give such an instruction was held to be prejudicial error because the defendant had testified that "he never intended to kill Mr. Rosenbaum and did not decide to take the property until after the attack had terminated" and because the other evidence was "not inconsistent with defendant's testimony that his attack on Mr. Rosenbaum was the result of a sudden quarrel" rather than being the means of effecting a planned robbery or burglary. (41 Cal.2d at 388, 391; see also *People* v. *Kerr*, 37 Cal.2d 11, 13-14 [229 P.2d 777].) The attorney general contends, however, that defendant's own testimony* demonstrates that the Carnine case is inapplicable "because [his testimony shows that] the intent to rob arose *after he had knocked Mr. Tuttle down*, but before the termination of his attack upon Mr. Tuttle, i.e., before he kicked Mr. Tuttle in the face and on the head at the base of the skull." [Italics added.] Defendant's testimony does not sustain that contention. In his testimony quoted above defendant explicitly stated that the blow with his fist knocked

---

*In addition to the testimony quoted above, the People cite the following excerpts: "I hit him. He was fixing to pass water when I hit him. Q. Then after you hit him he fell? A. He fell down on his hands and knees. Q. And after that, after he was down, you stated you kicked him? A. Yes, I kicked him. Q. Then your testimony is, is it not, that after you had him on the ground you decided to take his property? A. That is when I actually decided to take his money, is on account that I was on parole, and I knew that I was messed up anyway, and that's why I took his money and his car. . . . Q. You did not intend to rob him until after he was on the ground, after you knocked him down? A. That's correct. . . . Q. Why did you feel you had to rob him, Mr. Hudson? A. I didn't have no money and I had to get away from there on account, you know, if you get in a fight or anything while you are on parole, parole can be violated and that is the reason I left on account I took his money and the car, so on account I was on parole I had to get out of there. Q. Mr. Hudson, when did you intend to rob him? A. I intended to rob the man after I had knocked him down. . . . Q. When did you first intend to rob the man then? A. After I got him down. Q. After you got him down? A. Yes, sir. Q. You didn't intend to rob him before you knocked him down? A. No, sir."

Tuttle to his hands and knees, that after he "was down on all fours" defendant kicked him and "he went on down," and that "I decided *then* I got to take his money and get out of here for I haven't got any." [Italics added.] Thus, his testimony is clear that the intent to rob was not formed until after the attack had ceased and the deceased was lying unconscious on the ground. We must therefore conclude that the requested instruction should have been given.

Since defendant admitted that he had attacked Tuttle and had thereafter stolen his purse and his truck, his only available defense, aside from insanity, to the charge of murder in the first degree was that set forth in the refused instruction. Although the jury was not required to believe defendant's testimony that he did not decide to steal Tuttle's property until after the assault was completed (*People* v. *Kerr, supra*, 37 Cal.2d 11, 14), he was nevertheless entitled to have them properly instructed on the defense raised thereby. (*People* v. *Carmen*, 36 Cal.2d 768, 772-774 [228 P.2d 281], and cases cited.)

The other evidence introduced at the trial is not inconsistent with defendant's testimony that his attack on Tuttle was the result of a sudden quarrel and that the taking of his property was an afterthought. The evidence is inconsistent with the theory of a planned robbery. Defendant did not choose a victim from whom he could expect to obtain any large amount of money. He met his victim in a bar where both were known. Defendant called attention to the fact that they were leaving together. After the attack, he made no effort to conceal the body. He returned immediately to the bar driving Tuttle's truck and wearing his hat. He made a conspicuous display of having money to spend, which the bartender knew he did not have before he left with Tuttle. He stopped at a grocery store where he was known, and at a gasoline station in Stratford. After wrecking the truck, he made no effort to run away but chatted with two witnesses to the wreck until his brother arrived and drove him home. Had he planned to rob Tuttle and then killed him to prevent his identification as a robber, it is unlikely that he would leave a trail so easily followed.

As in the Carnine case, "The evidence presents a picture of a crime committed by a person whose behavior was generally erratic and who was at the time at least partially under the influence of alcohol. The crime had few, if any, of the indicia of careful planning. Under these circum-

stances it was a close question whether defendant first decided to rob [the victim] and then killed him in the perpetration of that robbery or first attacked him without premeditation and only thereafter decided to steal his property.

"It cannot be inferred from the fact that the jury brought in a verdict of murder of the first rather than of the second degree that it decided this question against defendant. The instructions* on second degree murder carefully pointed out that murder could not be of the second degree if it was committed in the perpetration of a robbery or burglary. Thus these instructions referred the jury to those defining murder committed in the perpetration of a robbery or burglary, and as pointed out above, none of the latter instructions explained to the jury defendant's only defense to the charge of murder committed in the perpetration of a robbery.

"In determining whether the error was prejudicial, it bears emphasis that the burden was on the prosecution to prove defendant guilty of murder of the first degree beyond a reasonable doubt. It was not incumbent upon defendant to convince the jury that his version of what occurred was true. He was entitled to be found guilty of no more than murder of the second degree if his testimony viewed in the light of the other evidence was sufficient to create a reasonable doubt as to his guilt of murder of the first degree." (41 Cal.2d at 391-392.) Under these circumstances, the refusal of the court to instruct the jury on defendant's theory of the case substantially and prejudicially affected the rights of defendant. Accordingly, a reversal is necessary to prevent a miscarriage of justice.

The judgment of conviction of murder of the first degree is reversed.

Gibson, C. J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.

---

*The instructions given in the present case were substantially the same as those given in the Carnine case. (See 41 Cal.2d at 388-389.)