[Crim. No. 173. Fifth Dist. Apr. 21, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ARTHUR BAUER, Defendant and Appellant.

Ben Curry, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws, Roger E. Venturi and Raymond Momboisse, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—Arthur Bauer was convicted of the first degree murder of Mary Livingston and sentenced to life imprisonment. After being represented by appointed counsel at the trial, the defendant filed a late appeal in propria persona from the "sentencing." This court, after due consideration of his application, permitted the late appeal and upon request appointed appellate counsel for the defendant.

Although, in the conclusion of the able brief filed in behalf of the defendant, the request is made only that this court reduce the degree of the offense (Pen. Code, § 1260; *People* v. *Tubby,* 34 Cal.2d 72, 79-80 [207 P.2d 51]), we note that as to several of the points raised, if they are sound, a reversal rather than a mere lowering of the degree of the crime would be required.

While the notice of appeal states that it is from the "sentence," it will be considered as being from the judgment of conviction (*People* v. *McDonough,* 198 Cal.App.2d 84 [17 Cal.Rptr. 643]), since the judgment and the sentence are in fact one in common parlance and contemplation. (*People* v. *Sweeney,* 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049].)

The defendant, through court-appointed counsel, presents five contentions: (1) that the trial court erred in receiving in evidence confessions made by the defendant to the county coroner and the district attorney; (2) that there were errors in giving and in failing to give instructions; (3) that there was prejudicial misconduct on the part of the prosecutor; (4) that error was committed in receiving evidence which was the product of an illegal search; and (5) that defendant did not enjoy effective representation by counsel at the trial.

Arthur Bauer met the victim, Mary Livingston, at a bar in Merced on October 31, 1964. After drinking all evening, the defendant and Mary went to Mariposa in her automobile where they stayed together at a motel until Sunday night, November 1; they then checked out and drove toward Merced. On the way, they stopped at Planada and between them drank two or three dollars' worth of beer. At about 2 a.m., they left the bar and drove directly to Mary's home in Merced where they both disrobed and went to bed. They commenced sexual intercourse, but the defendant said in his testimony that he did not remember whether they had finished before he strangled Mary. On the witness stand, Bauer testified that he "blacked out" during the commission of the crime and the first thing he then recalls was sitting on the edge of the bed

smoking a cigarette. He noticed that Mary was dead and uncovered; he put an electric blanket over her, turned it on, tuned a radio which was already operating to an all-night station, dressed, abstracted from Mary's purse the keys to her car and went outside, entered her car and drove it back to the main part of the city where he parked it, entered his hotel just before daylight and went to bed. Mary's car was used by the defendant thereafter in driving to Prather and Madera and about Merced until it was surrendered to the sheriff and his deputy as hereinafter stated.

Mrs. Ann Jackson, a casual acquaintance of the defendant, testified that on November 2, 1964, she met him in a bar and he told her that she was fortunate that she had not been with him over the weekend. The following day she again saw Bauer in the same bar and he then said that she was fortunate that she had not been with "them" over the weekend. On November 4th, the witness also saw the defendant in a saloon and he told her that he needed help; that he had killed a woman. She told him that she did not believe him and he stated that it was true. The witness asked the defendant why he had killed her, and he said because he wanted her car. The defendant gave Mrs. Jackson a bunch of keys and said, "These are her keys." The witness asked, "Whose keys?" and the defendant replied, "The woman I killed." The witness again asked "Who," and the defendant replied, "Mary." The defendant said that he had wanted her car "To go home and kill his wife." Mrs. Jackson testified that the defendant had been drinking but that he seemed to be responsive to questions and apparently knew what he was talking about. Mrs. Jackson telephoned Sheriff Latorraca, who arrived at the bar shortly thereafter, accompanied by Deputy Sheriff Earle McKeown. Mrs. Jackson introduced the sheriff to the defendant, but heard very little of the ensuing conversation, other than that Bauer stated he would show the sheriff where the body was. She handed the car keys to the sheriff.

Sheriff Latorraca testified that when he arrived at the bar he asked the defendant what kind of story he had to tell and the defendant replied, "This isn't a story, this is a true thing." He then told the sheriff that he had killed a woman. He told the sheriff that the woman was at her home and that her car was then parked in a parking lot on Sixteenth Street. The sheriff placed the defendant under arrest, had him enter the sheriff's car and drove across the parking lot to the victim's car. Deputy Sheriff McKeown verified the fact that the auto-

mobile keys fitted the ignition lock of the automobile which was registered in the name of Mary Livingston. The defendant stated he would show the officers where the house was located. Deputy Sheriff McKeown then advised the defendant of his right to remain silent, that anything he might say could be used against him in a court of law, that he was entitled to an attorney and "an attorney at the present time if he so wished." The defendant responded that he was the one who had had Mrs. Jackson call the police.

At the victim's home, the defendant remained in the automobile while the two officers went to the door. After a brief talk with a neighbor and receiving no answer to a knock, Deputy McKeown forced the latch on the screen, opened the door which was slightly ajar, and entered the house with the sheriff. They discovered the body of the victim in the bedroom. The sheriff turned off the electric blanket which covered the body. The deputy noticed that the radio beside the bed was playing. A drinking glass on a night stand bore the fingerprints of the defendant. The deputy left the house and questioned the defendant for 15 or 20 minutes. Mr. McKeown testified that Bauer appeared to have been drinking but was not intoxicated; he was responsive to the officer's questions. The defendant admitted killing Mary on November 2d. He stated that they had gone to bed and he had considered killing her for approximately 30 minutes before strangling her. He told the deputy, "I just had to have her car. It is the only excuse I have got. It is a sorry excuse to kill a woman. . . ." He stated that he hoped he killed her before she suffered. He did not try to revive her and he left within an hour after killing her. The defendant further stated that he had gone to Prather afterwards for the purpose of killing his wife but was not successful because his stepson blocked entry into the house and his wife threatened to shoot him if he came inside.

Kenneth Riggs, the county coroner, arrived pursuant to a telephone call. He talked with Bauer for about five minutes while the defendant was seated in the sheriff's car. The coroner inquired if the defendant knew the next of kin or any relatives of the decedent, to which the defendant answered, "No." The coroner asked if he had used a pillow, and Bauer replied that he had strangled Mary. The defendant said, "She did not deserve to die," and told Riggs that he wanted to use the victim's car for the purpose of going to Prather to kill his wife. Riggs testified that the defendant appeared to have been drinking, that his speech was "kind of slurry," but that the

answers were quite direct and the defendant was very cooperative.

Subsequently, Bauer was transported to the office of the district attorney, where a full confession was made, with a court reporter present. At the outset of the examination, the district attorney again advised the defendant of his right to counsel and his right to remain silent and asked if the defendant understood that he could have an attorney and that he could remain silent if he chose to do so, to which the defendant answered, "Yes." Bauer also acknowledged that he had already voluntarily given a statement to Deputy Sheriff McKeown and that the latter had advised him of his rights. After making a full confession but while interrogation was still under way, the following transpired: "A. [Defendant] Am I allowed a representative, because I really think you are getting close. I have admitted it, but. . . .

"Q. [District Attorney] You are allowed anything you wish. You have your full constitutional rights as I have already told you.

"A. I don't have but twenty bucks and that wouldn't buy a very good lawyer.

"Q. Well, if you are indigent you have a right to a Public Defender. As I have informed you you have a right to counsel, you have a right to remain silent and as stated Mr. McKeown has so advised you also." The interrogation then continued.

Subsequent independent investigation confirmed the fact that the defendant and the victim had been with each other for a period of approximately two days prior to the commission of the crime; that they had been staying together and had been drinking but that the defendant did not appear to be intoxicated. The condition of the body confirmed the fact that the victim's death had been caused by strangulation. The evidence also disclosed that the defendant had taken the victim's car and had gone to his hotel room in Merced, where he was seen by his landlady; that he was sober when she saw him on the day of the offense; that he subsequently left his room, drove to Prather and attempted to force an entry into his estranged wife's home, at first through the back door and then through the front door; that his entry was balked by the presence of his stepson and by his wife's threat to shoot him if he forced his way into her home; that he was subsequently seen in the town of Madera at approximately 3 a.m. on November 4, 1964, by Officer Myers; that Bauer was then asleep in the car parked in an alley, and the officer could not arouse him; that

when Officer Myers again passed at 5:25 a.m. he noticed that the same vehicle had been moved a distance of approximately one-half block; that the officer awakened the defendant and he appeared to have been drinking but was not drunk at the time. He told the officer that the car belonged to a friend; that he was coming from Auberry and was going to a dam site up north; that he had been drinking and thought he had better rest and sober up before he left town. He then drove away.

The defendant testified in his own behalf. His defense was that, although he remembered events before and after the killing, he had no memory of the actual act of strangulation. He testified that he was not aware of anything between the time of starting "love play" and subsequently sitting on the edge of the bed smoking a cigarette at which time he noticed that Mary was dead. He testified that he did not know why he had killed her, and that he did not believe he did it to get her car, although he admitted he had told some people that was the reason.

### The Confessions Were Properly Received In Evidence

■ With respect to the objections to evidence of the confessions made to the coroner and to the district attorney, it is our conclusion that they are entirely without foundation. Five confessions were made by the defendant. The first was to Mrs. Ann Jackson in the Turf Club bar; the second and third to Sheriff Latorraca and Deputy Sheriff McKeown of Merced County; the fourth to the coroner shortly after the second and third confessions; and the fifth to the district attorney on the same afternoon. No objection was made at the trial or on appeal to evidence of the confessions to Mrs. Jackson and to the sheriff and his deputy. The objection on the appeal is only that the two subsequent confessions made on the same afternoon to Coroner Riggs and to the district attorney should not have been admitted in evidence.

The answer is at least three-fold. In the first place, the defendant had been definitely advised of his rights by the deputy sheriff prior to the statement made to Coroner Riggs, and he was also fully advised of his rights by the district attorney before he took the formal statement from him. That he well understood such advice and in effect waived his rights to remain silent or to have an attorney is established by the evidence; he cannot complain, therefore, on this appeal. (*People v. Schader*, 62 Cal.2d 716, 727-728 [44 Cal.Rptr. 193, 401 P.2d 665]; *People v. McGee*, 238 Cal.App.2d 203, 206 [47

Cal.Rptr. 640].) Furthermore, the record shows conclusively that defense counsel at the trial desired to have the additional evidence involved in the two later confessions before the jury, believing that certain aspects of such confessions would be favorable to the defendant. In this connection, defense counsel stated to the trial court early in the case: ''. . . while I want all of the facts of this case to come out I think for the defendant's purpose it is as good that we allow the post arrest statements in as not because some portions of the post arrest statements are more beneficial to him than the statement made to the lady [Mrs. Jackson].'' In accordance with his plan, counsel for the defendant did not object to any of the evidence concerning either of the later statements. It cannot reasonably be held that a defense attorney, who knows what he is doing, cannot deliberately permit evidence concerning admissions or confessions of his client to be received in evidence. To say so would be to take away from the attorney for a defendant the right to conduct the defense in the manner which he thinks proper.

As a third reason why the evidence voluntarily admitted by the defense should not constitute a ground for a reversal, the two later confessions could not possibly be prejudicial, even if technically erroneous, for the reason that they did not substantially add to the confessions already properly in evidence. (*People* v. *Jacobson,* 63 Cal.2d 319, 328-330 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Cotter,* 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d 862].)

#### THERE WAS NO ERROR IN THE INSTRUCTIONS

■ Appellant also complains as to instructions given and refused. First of all, it is claimed that the court was in error by mentioning in connection with a definition of first degree murder that such crime would be of the first degree if the killing was committed by torture: ''FIRST AND SECOND DEGREE DISTINGUISHED. All murder which is perpetrated by means of poison or lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288 of the Penal Code, is murder of the first degree; and all other kinds of murder are of the second degree.'' (See Pen. Code, § 189.) As the appellant points out, the jurors were not instructed as to the legal definition of torture (see *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Tubby, supra,* 34 Cal.2d 72), and it is suggested that they might have

been misled by the mention of torture into believing that death by strangulation itself constituted torture as contemplated by law; the record is devoid of evidence that the defendant had the intent to cause Mary pain and suffering; in this connection, he testified, "I hope I killed her before she got hurt." While it is unquestionably true that the court cannot properly instruct a jury on a hypothesis which finds no support in the evidence (*People* v. *Eggers*, 30 Cal.2d 676, 687 [185 P.2d 1]), it is quite apparent from the context in which the instruction was given that the court in defining murder of the first and second degrees merely mentioned "torture" as it did, for example, "rape" and "mayhem," as being one of the factual situations which would make the degree of murder distinguishable. Generally speaking, a court has every right to "apposite quotations from a code," and this is exactly what was done here. The jury was told in the same detail as the code specified just what constituted the differentiation between first and second degree murder. There was no error on the part of the court, and the *Eggers* case can scarcely give satisfaction to the appellant here in view of the fact that what appeared to be an error in instructions in that case was held not to be prejudicial. It should be noted also that the theory of the prosecution that the murder was a first degree crime, because it was either a deliberate and premeditated killing or was committed in the attempt to perpetrate robbery, was stressed throughout the case by the district attorney, and no suggestion was made by the prosecution that the degree of the crime was ascertainable because of torture.

Complaint is made that the jury was instructed that it could find that the murder, if any, was first degree murder if it also found that it was committed in the perpetration of robbery. Robbery was defined in the words of the code section as follows: "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.) The evidence showed that, in his several confessions, the defendant had stated that he killed Mary because he had planned to take her automobile for the purpose of going to Prather and there killing his wife. He had thought this over for approximately 30 minutes before the killing. After the crime was accomplished, he went to her purse, abstracted her automobile keys, and then used them to take her car which was parked outside of the house.

Were these things done in the "immediate presence" of the victim within the meaning of the code section on robbery? The phrase used in the statutory definition of robbery is as old as the common law. In the language of Mr. Justice Rutledge in *Spencer* v. *United States,* 116 F.2d 801, 802: "It [immediate presence] therefore must mean at least an area within which the victim could reasonably be expected to exercise some physical control over [her] property." Since the early use of the phrase, the automobile has become an important item of personal property; obviously, an automobile is never parked in the living quarters, although the keys, which are the means of access to the driving mechanism, are often, as in this case, carried into the house. The car may be parked on the real property occupied by the owner or in the street in front of the building where the owner resides. It cannot be reasonably contended that an automobile located at the home of the owner is not there the subject of robbery, particularly as "Presence depends upon the circumstances of each case and implies an area with no metes and bounds." (*People* v. *Belenger,* 222 Cal.App.2d 159, 168 [34 Cal.Rptr. 918].) The broad meaning of "immediate" is thus defined in Webster's New International Dictionary (Third edition): "Being near at hand; not far apart or distant." (See also *People* v. *Lavender,* 137 Cal. App. 582 [31 P.2d 439]; *People* v. *Fields,* 190 Cal.App.2d 515, 519 [12 Cal.Rptr. 249].) The instruction was not erroneous. The intent to rob Mary Livingston of her keys and the car, if the jury found such intent to exist according to the uncontradicted evidence, would have justified the finding that the murder was of the first degree.

It should be remembered also that in addition to the felony-murder theory, the district attorney also produced evidence that would justify a determination by the jury that the murder was one characterized by deliberation and premeditation, and therefore a first degree crime. (*People* v. *Brubaker,* 53 Cal.2d 37, 40 [346 P.2d 8]; *People* v. *Caritativo,* 46 Cal.2d 68, 72 [292 P.2d 513]; *People* v. *Eggers, supra,* 30 Cal.2d 676.)

 However, defendant argues that, even if instructions dealing with robbery were proper, the trial court erred in not specifically instructing the jury *sua sponte* that the intent to rob must exist before the murder in order that it may be a first degree offense. He did not offer or request an instruction to that effect. As the People point out, the defense theory at the trial was that the defendant failed to remember the circumstances surrounding the killing, and that such failure was

caused by intoxication. The only evidence which remotely bears upon the theory now advanced is contained in his own testimony. He stated that he did not have any idea why he killed Mary Livingston. When he was asked, ''Was it to get her car?'' he replied, ''I don't believe so.'' He was also asked, ''Up until the time that you had noticed her dead do you know that you had coveted or wanted her car?'' to which he replied, ''No, I don't believe I did.'' It is questionable whether these uncertain and evasive answers standing alone suffice to raise a material issue as to the time of the formation of the intent to rob, i.e., whether that intent existed at the time of the killing. ▮▮ While the trial judge is required to instruct the jury on every material question upon which there is evidence deserving of consideration (*People* v. *Carnine,* 41 Cal.2d 384, 389 [260 P.2d 16]; *People* v. *Clark,* 202 Cal.App. 2d 513, 517 [20 Cal.Rptr. 803]), the trial judge is under no duty to speculate on all defenses the evidence may possibly raise, if any such defenses are not called to his attention by defense counsel. If the rule were otherwise, isolated sentences plucked from the cold record upon appeal might suggest in almost every case a far-fetched defense which the trial judge had overlooked. The sole authority cited by the defendant, *People* v. *Carnine, supra,* 41 Cal.2d 384, is not controlling. There, the defendant killed a store owner, dragged his body to a washroom and left it lying on the floor, and took money, clothing and the victim's car. At the trial he testified that he never intended to kill the victim, and did not decide to take the property, until after the attack had terminated. Thus, his sole defense to the charge of murder committed in the perpetration of robbery was lack of intent to rob at the time of the murder. The trial court refused his proffered instruction embodying this defense. The judgment of conviction was reversed on the ground that the instruction should have been given in the light of the evidence of that case, which presented ''a close question whether defendant first decided to rob Mr. Rosenbaum and then killed him in the perpetration of that robbery or first attacked him without premeditation and only thereafter decided to steal his property.'' (*People* v. *Carnine, supra,* 41 Cal.2d 384, 391.)

▮▮ Here, the defendant did not (as did the defendant in *Carnine*) unequivocally testify that the intent to take the victim's car was an afterthought. The scanty, uncertain testimony of the defendant above-quoted was not urged upon the trial court as a defense. No instruction, such as that offered in

*Carnine,* was here offered or requested. Under these circumstances, the trial judge was not required to consider the statements of the defendant as giving rise to a possible defense and to instruct thereon *sua sponte.*

Furthermore, it would seem, from a complete consideration of the instructions given, that the jurors could not have been misled or confused. Two instructions told them that murder is of the first degree if it is committed in the perpetration of or attempt to perpetrate robbery. The crime of robbery was then defined. They were next instructed as to the union of act and specific intent which must exist and told that, unless such specific intent so exists, the crime is not committed. We believe that the jury was sufficiently instructed on the issue of specific intent.

The defendant next complains that the trial judge did not, on his own motion, submit to the jury the question whether the defendant was properly advised of his right to counsel and his right to remain silent, and whether he intelligently waived those rights before considering the confessions which had been received in evidence. No case law on this subject is cited.

Assuming that when an incriminating statement is sought to be introduced, the trial judge should make a primary determination of admissibility and the question must then be submitted to the jury under appropriate instructions (see *People* v. *Schader, supra,* 62 Cal.2d 716), the point is not available to appellant for the reason that the request of his trial counsel that "post arrest statements" be admitted in evidence and his stipulation that the reported verbatim statement given by the defendant to the district attorney be read into evidence, removed from the case all possible issues relating to admissibility of those statements. There was thus no issue of fact to be submitted to the jurors, and no instruction was required.

Defendant next argues that the trial court erred in not giving, *sua sponte,* an instruction on the doctrine of diminished capacity to form the specific intent required to commit the crime. As mentioned at the trial, a theory of the defense was that, due to intoxication, the defendant suffered a loss of memory during the crucial period between the time he started making love to the victim until he choked her to death. It is, of course, well established that in a case involving a crime which requires a specific intent, the defense of mental illness not amounting to legal insanity is a material issue bearing upon the capacity of the defendant to form the

requisite specific intent. (*People* v. *Anderson,* 63 Cal.2d 351, 363-366 [46 Cal.Rptr. 763, 406 P.2d 43] ; *People* v. *Henderson,* 60 Cal.2d 482, 489-492 [35 Cal.Rptr. 77, 386 P.2d 677] ; *People* v. *Gorshen,* 51 Cal.2d 716, 733 [336 P.2d 492] ; *People* v. *Baker,* 42 Cal.2d 550, 569-571 [268 P.2d 705] ; *People* v. *Wells,* 33 Cal.2d 330, 343, 357 [302 P.2d 53].) In the *Henderson* case, *supra,* the Supreme Court held that where there is substantial evidence sufficient to inform the court that defendant is relying upon the defense of diminished capacity the court should, on its own motion, instruct the jury as to the legal significance of such evidence. (60 Cal.2d at p. 491.) In this case, as at the *Henderson* trial, the judge instructed the jury that: "The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity.

"For the purposes of the issues now on trial you must presume that the defendant was sane at the time of his alleged conduct which, it is charged, constituted the crime described in the information."[1] But at this point the similarity of the two cases disappears. In the *Henderson* case, the quoted instruction was the *only* instruction given which purported to tell the jury the legal rules for determining what the intent of the defendant was, and it "told them to look to the circumstances of the offense and 'defendant's 'sound mind' unless they found him to be an idiot, lunatic or legally insane." (60 Cal.2d at p. 492.) In this case, at the request of both the defendant and the People, the trial judge further instructed the jury as follows : "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act.

"If and when the proof shows that the defendant unlawfully killed a human being, and if the evidence also shows that at the time of the mortal assault the defendant was intoxicated, the jury is permitted and ought to consider such evidence of intoxication for the purpose of determining the intent

[1]There are minor changes in language in the instruction quoted in the *Henderson* opinion. (P. 492.)

with which the act was done.'' (CALJIC No. 319 (Revised).)

Furthermore, at the *Henderson* trial, the judge presiding refused to give an instruction offered by the defendant on manslaughter. (60 Cal.2d at p. 489.) ▮ In this case, the trial judge instructed the jury as to the definitions of murder, first and second degree, manslaughter, both voluntary and involuntary, malice, intent, the necessity for specific intent, and the defense of intoxication as bearing on specific intent.

The instruction in the form of CALJIC No. 319 (Revised) given at the request of the defendant is based on language contained in the leading case of *People* v. *Gorshen, supra,* 51 Cal.2d 716, which crystalized the doctrine of diminished capacity in the law of this state, overturning a long line of prior cases which held to the contrary.

It is a fair conclusion that the vice found in the instructions referred to in the *Henderson* and *Anderson* opinions, *supra,* is not present in the instant case and that the jurors were fully and fairly instructed on the issue of specific intent and the doctrine of diminished capacity.

▮ It is next charged that the district attorney was guilty of prejudicial misconduct in his cross-examination of the defendant, and in statements made in his closing argument, which it is claimed relate to the alleged improper cross-examination. Neither of these points is available on appeal in view of the fact that there was an entire absence of objection on the part of the defendant to any of the questions or to any part of the argument of the district attorney now condemned. (*People* v. *Steelik,* 187 Cal. 361 [203 P. 78]; *People* v. *McManus,* 180 Cal.App.2d 19, 33 [4 Cal.Rptr. 642]; *People* v. *Scaggs,* 153 Cal.App.2d 339, 359 [314 P.2d 793].) It may, however, be noted in passing that the cross-examination and the district attorney's argument seem to us to have been within proper bounds in view of the factors involved.

▮ It is also suggested that the search of Mary Livingston's house was illegal because there was no proof of a search warrant, and that, therefore, no evidence could properly be introduced with respect to the search or what it turned up. This contention fails to take note that the visit to the home of the victim was critical, and that the defendant is scarcely in a position to object to the entry into Mary Livingston's house in view of the fact he himself cooperated with the sheriff, after suggesting what the inspection of the house would show. The sheriff and his deputy had just been informed that something

very serious had happened in the house in question, that the defendant had said that he had murdered a woman there, and that the officers could not have been certain whether or not the victim was still breathing. It might have been essential to give immediate physical aid to a badly injured and dying woman. The entry in the circumstances was not improper. (*People* v. *Roberts*, 47 Cal.2d 374, 377-378 [303 P.2d 721]; *People* v. *Huber*, 232 Cal.App.2d 663, 670 [43 Cal.Rptr. 65].) Furthermore, no objection was made to this evidence at the trial, and the point, even if otherwise available, could not be urged on appeal. (*People* v. *Saldana*, 233 Cal.App.2d 24, 33 [43 Cal. Rptr. 312]; *People* v. *Swayze*, 220 Cal.App.2d 476, 501 [34 Cal.Rptr. 5]; *People* v. *Prado*, 190 Cal.App.2d 374, 378 [12 Cal.Rptr. 141].)

Lastly, the usual complaint of convicted defendants is made, namely, that he did not receive adequate representation by appointed counsel in the court below. Counsel on the appeal does not himself urge this point, saying that he thought that the attorney at the trial exercised ability in conducting the defense of a difficult case. It is certain that the representation at the trial was not of such a low order that it reduced the trial to a farce or sham and destroyed the essential integrity of the proceedings as a trial. (*People* v. *Ibarra*, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]; *People* v. *Twiggs*, 223 Cal. App.2d 455, 464 [35 Cal.Rptr. 859]; *People* v. *Schiers*, 160 Cal.App.2d 364, 377-378 [324 P.2d 981, 329 P.2d 1].) We believe that the record as a whole shows that trial counsel was experienced in the field of criminal trial work, and that his representation was ably conducted; practical confirmation lies in the fact that although the jury might well have concluded that this was a "foul and midnight murder," it only inflicted the lesser punishment provided by law for murder in the first degree.

We find no errors which would justify a reversal or a reduction of the degree of the offense.

The judgment is affirmed.

Stone, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 17, 1966.